# DELAWARE INDIANS *v.* CHEROKEE NATION.

## APPEAL FROM THE COURT OF CLAIMS.

No. 240.   Argued December 1, 2, 1903.—Decided February 23, 1904.

In a suit brought under § 25 of the act of June 28, 1898, 30 Stat. 495, by the Delaware Indians residing in the Cherokee Nation for the purpose of determining their rights in and to the lands and funds of the Cherokee Nation under their contract and agreement with the Cherokee Nation of April 8, 1867.

*Held* that the registered Delawares acquired in the 157,000 acres set off to them east of the ninety-sixth meridian only the right of occupancy during life with a right upon allotment of the lands to not less than 160 acres together with their improvements, and their children and descendants took only the rights of other citizens of the Cherokee Nation as the same are regulated by law.

*Held* that the Cherokee Nation has been recognized as a distinct political community, *Cherokee Fund Cases,* 117 U. S. 288, having its own consti-

tution and laws and power to administer the same, and it was not the purpose of the enabling act under which this suit was brought to revise the political action of the administration of the Nation in admitting persons to citizenship therein under authority of provisions of its constitution which were in force when the Delawares were consolidated with the Cherokee Nation.

*Held* that the enabling act contemplated a judgment of the court, determining the rights of the Delawares and Cherokees in the lands and funds of the Cherokee Nation, in such wise as to enable a division to be made conformable to the rights of the parties as judicially determined.

*Held* that the bill should not be dismissed because the Delawares have not proved their asserted claims but a decree should be entered finding the registered Delawares entitled to participate equally with Cherokee citizens of Cherokee blood in the allotment of lands.

THE facts are stated in the opinion of the court.

*Mr. Walter S. Logan,* with whom *Mr. Charles M. Demond* was on the brief, for appellants.

*Mr. John J. Hemphill* and *Mr. William T. Hutchings* for respondents.

MR. JUSTICE DAY delivered the opinion of the court.

On June 28, 1898, the Congress of the United States passed an act entitled "An act for the protection of the people of the Indian Territory and other purposes." 30 Stat. 495. By the twenty-fifth section of the act it is provided:

"That before any allotment shall be made of lands in the Cherokee Nation, there shall be segregated therefrom by the commission heretofore mentioned, in separate allotments or otherwise, the one hundred and fifty-seven thousand six hundred acres purchased by the Delaware tribe of Indians from the Cherokee Nation under agreement of April eighth, eighteen hundred and sixty-seven, subject to the judicial determination of the rights of said descendants and the Cherokee Nation under said agreement. That the Delaware Indians residing in the Cherokee Nation are hereby authorized and empowered to

bring suit in the Court of Claims of the United States, within sixty days after the passage of this act, against the Cherokee Nation, for the purpose of determining the rights of said Delaware Indians in and to the lands and funds of said nation under their contract and agreement with the Cherokee Nation dated April eighth, eighteen hundred and sixty-seven; or the Cherokee Nation may bring a like suit against said Delaware Indians; and jurisdiction is conferred on said court to adjudicate and fully determine the same, with right of appeal to either party to the Supreme Court of the United States."

Under this section the present suit was prosecuted in the Court of Claims by the Delaware Indians residing in the Cherokee Nation, as a tribe and individually, joined by certain others suing for the surviving registered Delawares, their children, descendants and personal representatives, against the Cherokee Nation, for the purpose of determining the right of the Delaware Indians "in and to the lands and funds of said nation" under the contract and agreement with the Cherokee Nation dated April 8, 1867. This contract sets forth:

"Now, therefore, it is agreed between the parties hereto, subject to the approval of the President of the United States, as follows:

"The Cherokees, parties of the first part, for and in consideration of certain payments and the fulfillment of certain conditions hereinafter mentioned, agree to sell to the Delawares for their occupancy, a quantity of land east of the line of the 96° west longitude, in the aggregate equal to one hundred and sixty acres for each individual of the Delaware tribe, who has been enrolled upon a certain register made February 18, 1867, by the Delaware agent, and on file in the Office of Indian Affairs, being the list of Delawares who elect to remove to the 'Indian country,' to which list may be added, only with the consent of the Delaware council, the names of such other Delawares as may, within one month after signing of this agreement, desire to be added thereto, and the selections of the lands to be purchased by the Delawares may be made by said Delawares in

any part of the Cherokee reservation east of said line 96° not already selected and in possession of other parties, and in case the Cherokee lands shall hereafter be allotted among the members of said nation, it is agreed that the aggregate amount of land herein provided for the Delawares to include their improvements according to the legal subdivisions when surveys are made (that is to say, one hundred and sixty acres for each individual), shall be guaranteed to each Delaware incorporated by these articles into the Cherokee Nation, nor shall the continued ownership and occupancy of said land by any Delaware so registered be interfered with in any manner whatever without his consent, but shall be subject to the same conditions and restrictions as are by the laws of the Cherokee Nation imposed upon native citizens thereof.

"Provided that nothing herein shall confer the right to alienate, convey or dispose of any such lands except in accordance with the constitution and laws of said Cherokee Nation.

"And the said Delawares, parties of the second part, agree that there shall be paid to the said Cherokees from the Delaware funds now held or hereafter received by the United States, a sum of money equal to one dollar per acre for the whole amount of one hundred and sixty acres of land for every individual Delaware who has already been registered upon the aforesaid list, made February 18, 1867, with the additions thereto heretofore provided for.

"And the Secretary of the Interior is authorized and requested to sell any United States stocks belonging to the Delawares to procure funds necessary to pay for said lands; but in case he shall not feel authorized, under existing treaties, to sell such bonds belonging to the Delawares, it is agreed that he may transfer such United States bonds to the Cherokee Nation, at their market value, at the date of such transfer.

"And the said Delawares further agree that there shall be paid from their funds now or hereafter to come into possession of the United States a sum of money which shall sustain the same proportion to the existing Cherokee national fund that

the number of Delawares registered as above mentioned and removing to the Indian country sustains to the whole number of Cherokees residing in the Cherokee Nation. And for the purpose of ascertaining such relative numbers the registers of the Delawares herein referred to, with such additions as may be made within one month from the signing of this agreement, shall be the basis of calculation as to the Delawares, and an accurate census of the Cherokees residing in the Cherokee Nation shall be taken under the laws of that nation within four months, and properly certified copies thereof filed in the Office of Indian Affairs, which shall be the basis of calculation as to the Cherokees.

"And that there may be no doubt hereafter as to the amount to be contributed to the Cherokee national fund by the Delawares, it is hereby agreed by the parties hereto that the whole amount of the invested funds of the Cherokees, after deducting all just claims thereon, is $678,000.

"And the Delawares further agree that in calculating the total amount of said national fund there shall be added to the said sum of $678,000 the sum of $1,000,000, being the estimated value of the Cherokee neutral lands in Kansas, thus making the whole Cherokee national fund $1,678,000; and this last mentioned sum shall be taken as the basis for calculating the amount which the Delawares are to pay into the common fund.

"Provided, that as the $678,000 of funds now on hand belonging to the Cherokees is chiefly composed of stocks of different values, the Secretary of the Interior may transfer from the Delawares to the Cherokees a proper proportion of the stocks now owned by the Delawares of like grade and value, which transfer shall be in part of the *pro rata* contribution herein provided for by the Delawares to the funds of the Cherokee Nation; but the balance of the *pro rata* contribution by the Delawares to said fund shall be in cash or United States bonds, at their market value.

"All cash, and all proceeds of stocks, whenever the same may fall due or be sold, received by the Cherokees from the

Delawares under the agreement, shall be invested and applied in accordance with the twenty-third article of the treaty with the Cherokees of August 11, 1866.

"On the fulfillment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided, shall become members of the Cherokee Nation, with the same rights and immunities, and the same participation (and no other) in the national funds, as native Cherokees, save as hereinbefore provided.

"And the children hereinafter born of such Delawares so incorporated into the Cherokee Nation shall, in all respects, be regarded as native Cherokees."

The treaties which led up to this agreement are referred to in the contract and were ratified in 1866. The fifteenth article of the treaty of August 11, 1866, between the United States and the Cherokee Nation provided:

"Article XV. The United States may settle any civilized Indians, friendly with the Cherokees and adjacent tribes, within the Cherokee country, on unoccupied lands east of 96 degrees, on such terms as may be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States, which shall be consistent with the following provisions, viz: Should any such tribe or band of Indians settling in said country abandon their tribal organization, there being first paid into the Cherokee national fund a sum of money which shall sustain the same proportion to the then existing national fund that the number of Indians sustain to the whole number of Cherokees then residing in the Cherokee country, they shall be incorporated into and ever after remain a part of the Cherokee Nation, on equal terms in every respect with native citizens. And should any such tribe, thus settling in said country, decide to preserve their tribal organizations, and to maintain their tribal laws, customs, and usages, not inconsistent with the constitution and laws of the Cherokee Nation, they shall have a district of country set off for their use by metes and bounds equal to one hundred and sixty acres,

if they should so decide, for each man, woman, and child of said tribe, and shall pay for the same into the national fund such price as may be agreed on by them and the Cherokee Nation, subject to the approval of the President of the United States, and in cases of disagreement the price to be fixed by the President.

"And the said tribe thus settled shall also pay into the national fund a sum of money, to be agreed on by the respective parties, not greater in proportion to the whole existing national fund and the probable proceeds of the lands herein ceded or authorized to be ceded or sold than their numbers bear to the whole number of Cherokees then residing in said country, and thence afterwards they shall enjoy all the rights of native Cherokees. But no Indians who have no tribal organizations, or shall determine to abandon their tribal organizations, shall be permitted to settle east of the ninety-sixth degree of longitude without the consent of the Cherokee national council, or of a delegation duly appointed by it, being first obtained. And no Indians who have and determine to preserve their tribal organizations shall be permitted to settle, as herein provided, east of the ninety-sixth degree of longitude without such consent being first obtained, unless the President of the United States, after a full hearing of the objections offered by said council or delegation to such settlement, shall determine that the objections are insufficient, in which case he may authorize the settlement of such tribe east of the ninety-sixth degree of longitude."

Article IV of the Delaware treaty, referred to in the agreement of April 8, 1867, is in the following terms:

"Article IV. The United States agree to sell to the said Delaware Indians a tract of land ceded to the government by the Choctaws and Chickasaws, the Creeks, or the Seminoles, or which may be ceded by the Cherokees in the Indian country, to be selected by the Delawares in one body in as compact a form as practicable, so as to contain timber, water, and agricultural lands, to contain in the aggregate, if the said Delaware

Indians shall so desire, a quantity equal to one hundred and
sixty (160) acres for each man, woman, and child who shall
remove to said country, at the price per acre paid by the United
States for the said lands, to be paid for by the Delawares out
of the proceeds of sales of land in Kansas, heretofore provided
for.   The said tract of country shall be set off with clearly and
permanently marked boundaries by the United States; and
also surveyed as public lands are surveyed, when the Delaware
council shall so request, when the same may, in whole or in
part, be allotted by said council to each member of said tribe
residing in said country, said allotment being subject to the
approval of the Secretary of the Interior."

At the time of moving upon these lands there were 985
registered Delawares, of whom 212 survived at the beginning
of this suit, together with children and descendants of those
deceased.

The agreement of April 8, 1867, was before this court in the
case of the *Cherokee Nation* v. *Journeycake,* 155 U. S. 196.
While the precise questions involved in the present controversy
were not then before the court, the rights adjudicated turned
upon the construction of the agreement of April 8, 1867, and
its nature and the history of the events which led up to its
execution by the parties thereto were the subjects of considera-
tion and determination by this court.   In that case it was held
that under the agreement the registered Delawares were in-
corporated into the Cherokee Nation, and as members and
citizens thereof were entitled to participate in the proceeds of
the sale of a portion of the Cherokee lands upon equal terms
with native Cherokee citizens.   The claim is made that the
contract of 1867 secured to the registered Delawares individu-
ally, or to the Delawares as a tribe the 157,000 acres of land
which were to be set off to them east of the ninety-sixth
meridian.   This agreement was made and entered into in
pursuance of the treaty stipulations hereinbefore referred to.
And while it may be regarded as arising from these preliminary
treaties with the United States, the care with which it was

made and the evident intention of the parties to deal at arm's length with full knowledge of their respective rights and aims, leaves little to be gained from these preliminary treaties as an aid to construction, except as a means of placing ourselves in the situation of the parties when the contract was signed and delivered.   It is the claim in behalf of the Delawares that if not technically an estate in fee, one was conveyed permanent in its character and transmissible by descent to the children and kin of the registered Delawares, or at least it was a holding which should endure so long as the Delawares and their descendants continued to exist as a tribe.

It was held in the *Journeycake* case to be the purpose of this agreement to incorporate the registered Delawares into the Cherokee Nation, with full participation in the political and property rights of citizens of that nation.   As a part of the general agreement, provision is made for rights in certain lands as a home for the Delawares who are to remove from their Kansas lands to the Indian Territory.   These lands are to pass to registered Delawares and they are to have the privilege of selecting them from unoccupied lands east of the line 96 degrees west longitude.   This right is conferred not upon the Delaware Nation, but upon certain registered Delawares who are to be incorporated into the Cherokee Nation.   To such is given a quantity of land equal in the aggregate to 160 acres for each registered Delaware, whose name is required to be entered upon a register to be filed in the Office of Indian Affairs, the lands thus conveyed being distinctly declared to be sold to the Delawares "for their occupancy."   This limitation, in what may be characterized as the *habendum* clause of the conveyance, does not import a holding beyond the life of the first taker, and is entirely inconsistent with the idea of permanency of tenure in the estate conveyed unless there is something in the nature of Indian titles to lands or in the terms of the instrument which requires an enlargement of an estate fcr occupancy into one the equivalent of a fee.   It is argued that an estate of occupancy is the ordinary estate of the Indian tribes and

embraces all the title held by them, the fee remaining in the United States. There is nothing to prevent the United States if it chooses to convey a fee to the Indian tribes from so doing.

Indeed, in the sixteenth clause of the treaty with the Cherokee Nation of August, 1866, it is provided that a fee may be conveyed to friendly Indians settled west of the ninety-sixth meridian. But for the present purpose, it is unnecessary to speculate as to the nature of the Indian title derived from the United States by treaty. The nature and extent of the Cherokee title has been settled by previous adjudications of this court. In the case of *Cherokee Trust Funds,* 117 U. S. 288, 308, it was held that the lands in the Cherokee Nation belonged to them as a political body, and not to its individual members, and speaking of the rights of individual Cherokees it was said: "He had a right to use parcels of the lands thus held by the nation, subject to such rules as its governing authority might prescribe."

The lands of the Cherokee Nation are not held in individual ownership, but are public lands, though held for the equal benefit of all the members. *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 488; *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294. Under the patent issued to the Cherokees for their lands, whatever title conveyed was to the Cherokees as a nation, and no title was vested in severalty in any of the Cherokees. *Cherokee Nation* v. *Journeycake,* 155 U. S. 196, 207.

In an agreement incorporating certain Delawares into the Cherokee Nation it is important to consider under what terms and conditions its citizens held and used the lands occupied by them. We are here dealing with the extent of the title conveyed as between Indian tribes, and the question is what did the Cherokees convey in the agreement to the Delawares who came within the terms of the compact and who were to be incorporated into the Cherokee Nation. In addition to the limitations expressed in the conveyance, "for occupancy," we find other terms of the instrument inconsistent with the grant of a perpetual estate. It is provided that in case the Cherokee

lands shall hereafter be allotted among the members of said nation, the aggregate amount of land provided for the Delawares to include their improvements according to the legal subdivisions when surveys are made (that is to say, one hundred and sixty acres for each individual), shall be guaranteed to each Delaware incorporated by the articles into the Cherokee Nation. The lands which are for occupancy of the Delawares are described as "Cherokee lands," and a provision made which secures 160 acres to include their improvements to each registered Delaware in case of allotment. If the full title was intended to be transferred to the Delawares, either as a tribe or individually, this stipulation to secure the rights of the Delawares in the contingency named was entirely superfluous. Further, the contract reads: "Nor shall the ownership and occupancy of said lands by any Delawares so registered be interfered with in any manner whatsoever without his consent, but shall be subject to the same conditions and restrictions as are by the laws of the Cherokee Nation imposed upon the native citizens thereof. Provided, that nothing herein shall confer the right to alienate, convey or dispose of any such land except in accordance with the constitution and laws of said Cherokee Nation."

These stipulations, wholly inconsistent with the full title of the Delawares to the lands in question, must be read in the light of the constitution and laws of the Cherokee Nation as to the holding of land by Cherokee citizens.

The provisions of the Cherokee constitution and the statutes passed in pursuance thereof pertinent to the subject are collected in the opinion of the Court of Claims in the *Journeycake* case, and are cited in a note to the opinion of this court in the same case. 155 U. S. 196, 207. From them it is apparent that lands to be held upon the same terms as the Cherokees hold their lands cannot be alienated by those who occupy and hold them, but the ownership is lodged in the Cherokee Nation. The individual has no right to alienate or lease the lands. The nation grants and restricts the right of occupancy. The title

to the lands is vested in the government, to be held and controlled in such wise as to promote the general welfare. Under these restrictions and conditions the registered Delawares held the lands set apart for their occupancy. In the laws of the Cherokee Nation we find that the use of the terms "for use and occupancy" was not an unfamiliar form of expression in describing the character and limitation upon the right of private ownership. Thus in the act relating to the public domain, and reserving tracts of lands one mile square along railroads at stations, and providing for the sale of town lots, it is provided that the purchaser shall acquire no other rights than those of use and occupancy. If the lands in question were granted in perpetuity to the Delawares, we have the awarding of an estate of this character carved out of lands recognized in the agreement as continuing to be Cherokee lands, belonging to the nation which expressly limits the conveyance of its lands to its own citizens for use and occupancy only. Again, if it was intended to provide for the children or heirs of the first takers—the registered Delawares—we should expect to find some words in the agreement competent for that purpose, conceding that the technical terms of the common law to create an estate in fee need not have been used. As to the children of the registered Delawares we find this specific provision: "And the children hereafter born of such Delawares so incorporated into the Cherokee Nation shall in all respects be regarded as native Cherokees." This provision is utterly inconsistent with the grant of an estate in the lands to survive the "occupancy" of the registered Delawares. Such children are to have the rights of native Cherokees and no more. Their parents were incorporated into the Cherokee Nation with certain specific rights; the children were to stand upon an equality with their adopted brethren of the Cherokee blood.

The importance of the issue now distinctly made as to the title to these lands has led us to give renewed examination to the question of the extent and character of the interest conveyed to the Delawares, in the lands in controversy. In the

*Journeycake* case, while it is true that the precise question was not the same as is now presented, full consideration to all the terms of this contract was given in order to determine the interests of the Delawares in the Cherokee lands sold, and the court, speaking by Mr. Justice Brewer, used this pertinent language, the force of which has not been diminished in the light of subsequent examination aided by the arguments and briefs of counsel now presented: "So far as the provision in the agreement for the purchase of homes is concerned, it will be perceived that no absolute title to these homes was granted. We may take notice of the fact that the Cherokees in their long occupation of this reservation had generally secured homes for themselves; that the laws of the Cherokee Nation provided for the appropriation by the several Cherokees of lands for personal occupation, and that this purchase by the Delawares was with the view of securing to the individual Delawares the like homes; that the lands thus purchased and paid for still remain a part of the Cherokee reservation. And as a further consideration for the payment of this sum for the purchase of homes the Delawares were guaranteed not merely the continued occupancy thereof, but also that in case of a subsequent allotment in severalty of the entire body of lands among the members of the Cherokee Nation, they should receive an aggregate amount equal to that which they had purchased, and such a distribution as would secure to them the homes upon which they had settled, together with their improvements. So that if, when the allotment was made, there was for any reason not land enough to secure to each member of the Cherokee Nation 160 acres, the Delawares were to have at least that amount, and the deficiency would have to be borne by the native Cherokees *pro rata*. In other words, there was no purchase of a distinct body of lands, as in the case of the settlement of other tribes as tribes within the limits of the Cherokee reservation. The individual Delawares took their homes in and remaining in the Cherokee reservation, and as lands to be considered in any subsequent allotment in severalty among the members of

the Cherokee Nation.   All this was in the line of the expressed
thought of a consolidation of these Delawares with and the
absorption of them into the Cherokee Nation as individual
members thereof.   If it be said that all of the Delaware trust
funds were not turned into the national fund it will be remem-
bered that there was no impropriety in the reservation of a
part thereof in order to enable the Delawares to make such
improvements as they might desire on the tracts that they
selected for homes, and also that there was no certainty that
all the members of the Delaware tribe would elect to remove
to the Cherokee country, and that those who remained in Kan-
sas were entitled to their share in the Delaware national funds."

If such be the true construction of the agreement, it is never-
theless insisted that it should not be literally enforced in view
of the understanding of the parties, more particularly of the
Delawares, that they were thereby receiving full title to the
occupied lands.   To establish this contention it is claimed that
in view of the character of the contracting parties they should
not be held to the strict rule of evidence which denies the com-
petency of parol testimony to contradict written agreements,
and a class of cases is cited of which *Worcester* v. *Georgia*, 6 Pet.
515, may be taken as an example.   The language of Mr. Jus-
tice McLean is quoted, in which he said (p. 582):

" The language used in treaties with the Indians should never
be construed to their prejudice.   If words be made use of
which are susceptible of a more extended meaning than their
plain import, as connected with the tenor of the treaty, they
should be considered as used in the latter sense. . . . How
the words of the treaty were understood by this unlettered
people, rather than their critical meaning, should form the rule
of construction."

But the learned Justice was here dealing with a treaty nego-
tiated between the representatives of the United States and
those of the Indians, wherein the disparity of the contracting
parties in education and knowledge of law and the use of lan-
guage is obvious.

The contract of April 7, 1867, was negotiated between representatives of Indian nations meeting upon equal terms. In the testimony of John G. Pratt, called for the Delawares, and at one time Indian agent for the Delaware agency, it appears:

"Question. Do you know whether or not the agreement frequently referred to in your testimony was read over to the two delegations representing the Delawares and Cherokee tribes of Indians?

"Answer. It was read over repeatedly; read over and corrected and altered and read over again several times, and each party put in his suggestions, until they finally harmonized.

"Question. Then, as I understand, the agreement, as finally signed, expressed the wishes of both sides, and both sides were fully satisfied with all it contained?

"Answer. No; the Delawares were not satisfied, but they signed because it was the best they could do. They wanted to own the land outright.

"Question. They did not contend at any time afterwards that the agreement did not fully express what they intended to express, did they?

"Answer. No, sir; I did not hear anything of that kind."

We can perceive no room in this case for a departure from the familiar rules of the law protecting written agreements from the uncertainties of parol testimony. The testimony offered was in the main that of interested persons nearly thirty years after the agreement had been reduced to writing and signed by the parties thereto. Nor can we find a latent ambiguity in the terms of the contract which requires the admission of parol testimony to explain its effect. In the light of the circumstances and the language used in the writing, its construction is not rendered difficult because of latent ambiguities. It is claimed as a cogent circumstance, which should be considered in construing this agreement, that the Cherokee Nation received one dollar per acre for these lands —a sum sufficient to cover their full value, and of consequent importance in determining the character of the estate con-

veyed. In the *Journeycake* case it was held that, in considera-
tion of the sum paid for citizenship rights, the Delawares
obtained an interest in the lands of the Cherokee Nation, al-
though the same were not considered in making up the sum
paid for what has been denominated the right of citizenship.
In that case it is pointed out that at the time the agreement
under consideration was made the Cherokee Nation possessed,
in addition to the "neutral" lands in Kansas, which were
estimated at $1,000,000 in making up the total of the Cherokee
national fund of $1,678,000 upon the basis of which the Dela-
wares paid into the common fund—

"Strip" lands in Kansas (about) . . . . . . . . . . . .          400,000  acres.
Lands west of 96 degrees, Indian Territory,
    (about) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          8,000,000      "
Lands east of 96 degrees, Indian Territory
    Home reservation (about) . . . . . . . . . . . .          5,000,000      "

In that case it was held that the Delawares acquired a right
in the distribution of the proceeds, not only of the Kansas
lands, but as well in such sales as were made of this vast do-
main held by the Cherokee Nation. Of this feature of the
agreement Mr. Justice Brewer, in the *Journeycake* case, says:
"Neither should too much weight be given to the fact that the
Delawares were to pay for their homes at the rate of one dollar
an acre, for by that purchase they acquired no title in fee
simple, and it is not unreasonable to believe that the price thus
fixed was not merely as compensation for the value of the
lands, (to be taken in the eastern portion of the reservation,
where the body of the Cherokees had their homes, and there-
fore probably the most valuable portion of the entire reserva-
tion,) but also as sufficient compensation for an interest in the
entire body of lands, that interest being like that of the native
Cherokees, limited to a mere occupancy of the tracts set apart
for homes, with the right to free use in common of the un-
occupied portion of the reserve, and the right to share in any
future allotment."

We conclude; then, that the registered Delawares acquired in these lands only the right of occupancy during life, with a right upon allotment of the lands, to not less than 160 acres together with their improvements, and the children and descendants of such Delawares took only the rights of other citizens of the Cherokee Nation as the same are regulated by its laws.

The bill further seeks to exclude from the allotment of Cherokee lands and funds certain citizens alleged to have been illegally admitted to citizenship, thereby wrongfully diminishing the shares of the Delawares in the common property. At the time of the agreement, of April 7, 1867, the constitution, secs. 2 and 5, of the Cherokee Nation had been amended to read:

"Sec. 2. The lands of the Cherokee Nation shall remain common property until the national council shall request the survey and allotment of the same. in accordance with the provisions of article 20th of the treaty of 19th July, 1866, between the United States and the Cherokee Nation.

"Sec. 5. No person shall be eligible to a seat in the national council but a male citizen of the Cherokee Nation, who shall have attained to the age of twenty-five years, and who shall have been a *bona fide* resident of the district in which he may be elected at least six months immediately preceding such election. All native-born Cherokees, all Indians, and whites legally members of the nation by adoption, and all freedmen who have been liberated by voluntary act of their former owners or by law, as well as freed colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months from the 19th day of July, 1866, and their descendants who reside within the limits of the Cherokee Nation, shall be taken and deemed to be citizens of the Cherokee Nation."

These constitutional provisions were in full force when the Delawares acquired their rights and when they were incorporated, or, as the agreement expressed it, "consolidated," with

the Cherokee Nation. Under its terms the Delawares have participated in political rights and have taken part in the government of the nation. It is claimed that these amendments were illegally adopted for want of compliance with authorized methods for amending the national constitution. But the nation has never undertaken to set them aside or call in question their force and effect. They were in the fundamental law when the Delawares were made a part of the Cherokee Nation and the rights exercised were only those belonging to the nation when the Delawares saw fit to subject themselves to the laws of a new nation of which they were to become a component part upon equal terms with other citizens. The Cherokee Nation has many of the rights and privileges of an independent people. They have their own constitution and laws and power to administer their internal affairs. They are recognized as a distinct political community and treaties have been made with them in that character. *Cherokee Trust Fund Cases*, 117 U. S. 288. It is not reasonable to suppose that in the act under which these proceedings were brought it was intended to authorize inquiry into the administration of the political affairs of the Cherokee Nation with a view to setting aside the adoption of constitutional amendments and the revision of political action in admitting persons to citizenship in the nation under authority of its constitution. The same conclusion disposes of the contention of the appellants that relief can be granted in this case in respect to alleged maladministration of the financial affairs of the Cherokee Nation with a view to holding it to account in favor of the Delawares prosecuting this suit. We are authorized by the enabling act to determine the contractual rights of the Delawares in the national lands and funds, not to overhaul the political and administrative action of the Cherokee Nation.

The act authorizing this suit contemplates a determination of the rights and interest of the Delawares residing in the Cherokee Nation in the lands and funds of the Cherokee Nation under the compact of April, 1867. That it was the purpose

of Congress to have a full and final determination of such rights is further shown in the Cherokee allotment act of July 1, 1902. Section 23 of this act provides:

"SEC. 23. All Delaware Indians who are members of the Cherokee Nation shall take lands and share in the funds of the tribe, as their rights may be determined by the judgment of the Court of Claims, or by the Supreme Court if appealed, in the suit instituted therein by the Delawares against the Cherokee Nation, and now pending; but if said suit be not determined before said commission is ready to begin the allotment of lands of the tribe as herein provided, the commission shall cause to be segregated one hundred and fifty-seven thousand six hundred acres of land, including lands which have been selected and occupied by Delawares in conformity to the provisions of their agreement with the Cherokees dated April eighth, eighteen hundred and sixty-seven, such lands so to remain, subject to disposition according to such judgment as may be rendered in said cause; and said commission shall thereupon proceed to the allotment of the remaining lands of the tribe as aforesaid. Said commission shall, when final judgment is rendered, allot lands to such Delawares in conformity to the terms of the judgment and their individual rights thereunder. Nothing in this act shall in any manner impair the rights of either party to said contract as the same may be finally determined by the court, or shall interfere with the holdings of the Delawares under their contract with the Cherokees of April eighth, eighteen hundred and sixty-seven, until their rights under said contract are determined by the courts in their suit now pending against the Cherokees, and said suit shall be advanced on the dockets of said courts and determined at the earliest time practicable."

These acts contemplate a judgment of the court which shall determine the rights of the Delawares and Cherokees in the lands and funds of the Cherokee Nation in such wise as to enable a division to be made conformable to the rights of the parties as judicially determined. The Court of Claims ren-

dered a decree dismissing the bill. Whilst agreeing with the conclusions reached in that court, as to the rights of the Delawares, we think the bill was broad enough in its allegations and prayer for relief to require a definite settlement of the rights in controversy. Instead of dismissing the bill we think a decree should have been entered finding the registered Delawares entitled to participate equally with Cherokee citizens of Cherokee blood in the allotment of lands of the Cherokee Nation, with the addition that if there is not enough land to give to each citizen of the nation 160 acres, then the registered Delawares shall be given that quantity, together with their improvements. In all other respects the Cherokee citizens, whether of Delaware or Cherokee blood, should be given equal rights in the lands and funds of the Cherokee Nation. The decree dismissing the bill is so modified as to conform to the terms just stated; and as so modified it is

*Affirmed.*