## WHITE *et al.* v. STARBUCK *et al.*

No. 2788.   Opinion Filed June 19, 1913.

Rehearing Denied December 9, 1913.

(133 Pac. 223.)

1.    INDIANS—Trusts—Action to Establish.   A petition which alleged that plaintiff, a member of the Cherokee Tribe of Indians, filed upon certain land in March, 1903; that she has been in possession of the land ever since that date; that on the 13th of May, 1904, a Delaware Indian filed a contest on a portion of the land filed on by plaintiff in March, 1903; that plaintiff and the contestant compromised in November, 1904, and plaintiff confessed judgment in favor of the contestant for the portion claimed in the contest, and paid the contestant $200, and the contestant agreed to release her claim to the land in controversy and other land; that plaintiff leased the land in controversy for oil and gas purposes in August, 1904; that the lessee went into possession of the land and bored two wells thereon and paid plaintiff royalties thereon; that the Commissioner to the Five Civilized Tribes on the 28th of June, 1906, arbitrarily, on his own motion and without notice to plaintiff, canceled her filing; that on said 28th day of June, 1906, Amos White, one of the defendants, presented to the Land Office a bill of sale from the Delaware, who formerly claimed some rights in the property, executed in consideration of the sum of $12, and that the land was allotted to him, and that plaintiff exhausted her remedies before the Interior Department in endeavoring to have the order canceling her filing revoked, states a cause of action, which, if true, entitles her to have a judgment decreeing that White holds the land as her trustee.

2.    SAME—Allotment—Cancellation.   The lands in the Cherokee Nation, not segregated from allotment as provided by section 25 of the Curtis Bill (Act June 28, 1898, c. 517, 30 St. at L. 504), were subject to allotment prior to the final decision of the case of Delaware Indians v. Cherokee Indians, 193 U. S. 127, 24 Sup. Ct. 342, 48 L. Ed. 646, and a filing on such land could not be canceled after the expiration of nine months from the date of the filing in the absence of fraud.

3.    SAME—Sale of Improvements.   Act April 21, 1904, c. 1402, 33 St. at L. 189, and Act March 3, 1905, c. 1479, 33 St. at L. 1048, giving Delaware Indians the right to sell improvements on lands of which they were in rightful possession April 21, 1904, in excess of the amounts which they could take as their allotments, did not give them the right to sell improvements on lands which had been allotted to members of the Cherokee Tribe and in possession of such members more than a year prior to the 21st of April, 1904.

(Syllabus by Rosser, C.)

*Error from District Court, Washington County;*
*John J. Shea, Judge.*

Action by Goldie Starbuck against Amos White, W. G. Sawyer, and others. Judgment for plaintiff, and defendants named bring error. Affirmed.

*Geo. S. Ramsey* and *C. L. Thomas,* for plaintiffs in error.

*Allen & Nichols,* for defendants in error.

Opinion by ROSSER, C. This is an action by Goldie Starbuck, as plaintiff, against Amos White and others, as defendants, to have the defendant Amos White decreed to be the trustee for the plaintiff of certain lands in the Cherokee Nation. The petition alleges, in substance, that plaintiff is a member of the Cherokee Tribe of Indians; that the land in controversy was allotted to her by the Commissioner to the Five Civilized Tribes on the 2d day of March, 1903, and that she received certificates of allotment therefor upon that date; that afterwards, on the 13th of May, 1904, Ida M. Swannock instituted a contest against plaintiff for certain land filed upon by plaintiff, but afterwards, on the 1st day of November, 1904, a compromise was entered into between said Ida M. Swannock and the plaintiff by which the plaintiff agreed to confess judgment for the portion claimed by Ida M. Swannock in her contest, and Ida M. Swannock agreed to relinquish all her claims, if she had any, to the improvements upon any other part of the land selected as the allotment of the plaintiff, and that in pursuance of the agreement Ida M. Swannock went before the Commissioner and relinquished all of her claims, and that the plaintiff also paid Ida M. Swannock $200 in cash in further consideration of the claim; that the plaintiff is now and has been ever since the 2d of March, 1903, in the actual, open, notorious, peaceable, and undisputed possession of all her allotment, and all the improvements; that on or about the 5th of August, 1904, plaintiff executed to one Benjamin F. Holmes an oil and gas mining lease upon the land selected by her, and that he began drilling on the lands, and up until the month of June, 1906, he drilled seven wells upon the land leased to him by the

plaintiff, two of which were upon the particular portion of the land now in controversy; that on or about the 28th of June, 1906, the Commissioner to the Five Civilized Tribes arbitrarily, on his own motion and without notice to the plaintiff, pretended to cancel her allotment certificate and to cancel her filing on the real estate in controversy, and that said pretended cancellation was procured to be made by the defendants Amos White and W. G. Sawyer, pretending to act for the said Ida M. Swannock, by wrongfully and unlawfully and without the knowledge or consent of the said Ida M. Swannock, making application to the Commissioner to the Five Civilized Tribes to have the lands in controversy certified by said Commissioner as improved Delaware surplus holdings of the said Ida M. Swannock under Acts April 21, 1904, and March 3, 1905, in violation of the agreement made between the plaintiff and Ida M. Swannock; that the plaintiff had no notice, either actual or constructive, that the Commissioner intended to consider the question of canceling her filing on the 28th of June, or any other time, and that the first notice she received of his intention was by a letter of date of July 5, 1906, mailed by the said Commissioner to her at Chanute, Kan., which notified her of the pretended cancellation; that on the 28th of June, 1906, Amos White, one of the defendants, presented to the Cherokee Land Office a pretended approved bill of sale, executed by Ida M. Swannock, dated June 21, 1906, for certain pretended improvements on the land in controversy in this action, and which purported to convey them to the defendant Amos White for the sum of $12, and that the land was allotted to him. The petition also alleges that, if Ida M. Swannock ever had any rights to the improvements, she had relinquished them long prior to the 21st of June, 1906, and that Amos White obtained no right to the improvements by virtue of said pretended bill of sale; that on the 17th of July, 1906, plaintiff filed a motion for rehearing with the Commissioner, who overruled same without allowing her to appear and introduce any evidence; that she took an appeal from his decision, and that on or about the 2d of February, 1907, the Commissioner of Indian Affairs affirmed his decision; that she took an appeal from the decision of the Com-

missioner of Indian Affairs to the Secretary of the Interior, and that on April 13, 1907, he affirmed the decision of the Commissioner of Indian Affairs; that afterwards, on the 4th of May, 1907, she filed her complaint with the Commissioner to the Five Civilized Tribes, alleging the facts with reference to the cancellation of her allotment certificate, and that the relief sought was also denied; that each of the officers have committed serious and gross errors of law in pretending to cancel the filings and certificate of allotment of plaintiff, and in awarding the land to Amos White, and refusing to permit the plaintiff to show by evidence her right to hold the real estate in controversy as a portion of her allotment; that the defendants Amos White and W. G. Sawyer have at all times mentioned known that plaintiff was in the actual, open, notorious, and peaceable possession of the real estate in controversy, together with the improvements thereon, and knew that she had leased the land to Holmes for oil and gas purposes, and knew that he had expended a large sum of money in developing it.    She attached copies of the decision of the Secretary of the Interior affirming the decision of the Commissioner of Indian Affairs affirming the action of the Commissioner to the Five Civilized Tribes dismissing the complaint which plaintiff filed May 4, 1907, asking that the allotment of Amos White upon the land in controversy be canceled.

The evidence shows that the plaintiff filed on the land in controversy, together with other land, March 2, 1903.    On the 13th of May, 1904, Ida M. Swannock filed with the Commissioner to the Five Civilized Tribes a statement of the lands held by her April 21, 1904, in excess of the land allotable by her.    This statement did not include the land in controversy.    The fact that it did not tends to support plaintiff's theory that Miss Swannock intended to release all the land she had claimed, except that for which plaintiff confessed judgment in her favor.    Plaintiff asserts that it did not, but a man named Goodykoontz appeared before the Commissioner later and made claim for her, and the department seems to have regarded the claim by him as sufficient. Miss Swannock also instituted a contest as to certain land which had been filed upon by plaintiff.    On the 5th of August, 1904,

plaintiff executed an oil and gas mining lease on the lands to Benjamin F. Holmes, and that lease was approved by the Secretary of the Interior January 6, 1905. On the 14th of November, 1904, the plaintiff confessed judgment in favor of Miss Swannock to the land upon which the contest had been filed. It would seem from the record that there was a settlement of all differences between these women on that day, though the land in controversy was not described. Goodykoontz testified with reference to the excess land of Miss Swannock. Miss Swannock, in her testimony given later, stated that Goodykoontz's statement was correct, but it does not appear that it was read to her or that she understood what the statement was, and the land in controversy was not described in her examination, either in question or answer. Another hearing was had in 1906, but the notice to plaintiff to appear was addressed to Coffeyville, Kan., instead of Chanute, Kan., her post office, and she did not receive it. It is a matter for remark that the record of the Commissioner showed her post office was Chanute, and other notices were mailed to her there, both before and after the one giving notice of the hearing which she failed to receive. Following this hearing, the filing was canceled. The first notice that she had of the cancellation was on the 9th of July, 1906, and from that time on she has been making all reasonable efforts to get a hearing, but has never been permitted to appear and offer evidence. On the 21st of June, 1906, Miss Swannock sold the improvements on the land in controversy to Amos White for the consideration of $12, and on the 28th of June White presented the bill of sale to the Land Office, at which time the filing of Goldie Starbuck was canceled, and White was permitted to file upon the land. The evidence also shows that certain lands in the same township with the land in controversy were segregated from allotment in accordance with the provisions of section 25, Act June 28, 1898, 30 St. at L. 495, c. 517, and of section 23, Act July 1, 1902, 32 St. at L. 716, c. 1375, but the land in controversy was not segregated. The testimony is not clear as to how much of the land in controversy was improved prior to the time it was filed.

The defendants claim title through Ida M. Swannock, and they base her right upon the following provisions of the statutes and treaties between the United States and the Indians:

(1)　The Treaty of 1866 of the Delaware Indians (Kapler's Indian Treaties, 937; 14 St. at L. 793), by which it was agreed that the Delaware Indians should move to the Indian Territory.

(2)　An agreement between the Delaware Indians and the Cherokee Indians entered into April 8, 1897, by which it was agreed that the Cherokee Nation should sell to the Delawares land amounting altogether to 160 acres for each individual Delaware removing to the Cherokee Nation, and which further pro- vided:

"And in case the Cherokee lands shall hereafter be allotted among the members of said nation, it is agreed that the aggre-. gate amount of land herein provided for the Delawares to include their improvements according to the legal subdivision when sur- veys are made (that is to say, 160 acres for each individual) shall be guaranteed to each Delaware incorporated by these arti- cles into the Cherokee Nation. * * * On the fulfillment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided shall become members of the Cherokee Nation, with the same rights and immunities and the same participation (and no other) in the national funds, as native Cherokees, save as hereinabove provided. And the chil- dren hereafter born of such Delawares so incorporated into the Creek Nation shall, in all respects, be regarded as native Chero- kees."

See *Delaware Indians v. Cherokee Nation,* 193 U. S. 127, 24 Sup. Ct. 342, 48 L. Ed. 646, for the material portion of the text of this agreement.

(3)　Section 25 of the Act of June 28, 1898 (30 St. at L. 495), entitled "An act for the protection of the people of the Indian Territory, and for other purposes," commonly known as the Curtis Bill, as follows:

"That before any allotment shall be made of lands in the Cherokee Nation, there shall be segregated therefrom by the Commission heretofore mentioned, in separate allotments or other- wise, the one hundred and fifty-seven thousand six hundred acres. purchased by the Delaware Tribe of Indians from the Cherokee Nation under agreement of April eighth, eighteen hundred and

sixty-seven, subject to the judicial determination of the rights of said descendants and the Cherokee Nation under said agreement. That the Delaware Indians residing in the Cherokee Nation are hereby authorized and empowered to bring suit in the Court of Claims of the United States, within sixty days after the passage of this act, against the Cherokee Nation, for the purpose of determining the rights of said Delaware Indians in and to the lands and funds of said nation under their contract and agreement with the Cherokee Nation dated April eighth, eighteen hundred and sixty-seven; or the Cherokee Nation may bring a like suit against said Delaware Indians; and jurisdiction is conferred on said court to adjudicate and fully determine the same, with right of appeal to either party to the Supreme Court of the United States."

(4)   Section 23, Act July 21, 1902 (32 St. at L. 716, c. 1375), as follows:

"All Delaware Indians who are members of the Cherokee Nation shall take lands and share in the funds of the tribe, as their rights may be determined by the judgment of the Court of Claims, or by the Supreme Court if appealed, in the suit instituted therein by the Delawares against the Cherokee Nation, and now pending; but if said suit be not determined before said Commission is ready to begin the allotment of lands of the tribe as herein provided, the Commission shall cause to be segregated one hundred and fifty-seven thousand six hundred acres of land, including lands which have been selected and occupied by Delawares in conformity to the provisions of their agreement with the Cherokees dated April eighth, eighteen hundred and sixty-seven, such lands so as to remain, subject to disposition according to such judgment as may be rendered in said cause; and said Commission shall thereupon proceed to the allotment of the remaining lands of the tribe as aforesaid. Said Commission shall, when final judgment is rendered, allot lands to such Delawares in conformity to the terms of the judgment and their individual rights thereunder. Nothing in this act shall in any manner impair the rights of either party to said contract as the same may be finally determined by the court, or shall interfere with the holdings of the Delawares under their contract with the Cherokees of April eighth, eighteen hundred and sixty-seven, until their rights under said contract are determined by the courts in their suit now pending against the Cherokees, and said suit shall be advanced on the dockets of said courts and determined at the earliest time practicable."

(5)   A portion of Act April 21, 1904 (33 St. at L. 189-205, c. 1402), as follows:

"That the Delaware-Cherokee citizens who have made improvements, or are in rightful possession of such improvements, in the Cherokee Nation at the time of the passage of this act shall have the right to first select from said improved lands their allotments, and thereafter, for a period of six months shall have the right to sell the improvements upon their surplus holdings of lands to other citizens of the Cherokee Nation entitled to select allotments at a valuation to be approved by an official to be designated by the President for that purpose; and the vendor shall have a lien upon the rents and profits of the land on which the improvements are located for the purchase money remaining unpaid; and the vendor shall have the right to enforce such lien in any court of competent jurisdiction.   The vendor may, however, elect to take and retain the possession of the land at a fair cash rental, to be approved by the official so as aforesaid designated, until such rental shall be sufficient to satisfy the unpaid purchase price, and when the purchase price is fully paid he shall forthwith deliver possession of the land to the purchaser:   Provided, however, that any crops then growing on the land shall be and remain the property of the vendor, and he may have access to the land so long as may be necessary to cultivate and gather such growing crops.   Any such purchaser shall, without unreasonable delay, apply to select as an allotment the land upon which the improvements purchased by him are located, and shall submit with his application satisfactory proof that he has in good faith purchased such improvements."

(6)   A portion of Act March 3, 1905 (33 St. at L. 1071, c. 1479), as follows:

"That Delaware-Cherokee citizens who have made improvements upon lands in the Cherokee Nation on April twenty-first, nineteen hundred and four to which there is no valid adverse claim, shall have the right within six months from the date of the approval of this act to dispose of such improvements to other citizens of the Cherokee Nation entitled to select allotments at a valuation to be approved by an official to be designated by the President for that purpose and the amount for which said improvements are disposed of, if sold according to the provisions of this act, shall be a lien upon the rents and profits of the land until paid, and such lien may be enforced by the vendor in any court of competent jurisdiction:   Provided, that the right of any Delaware-Cherokee citizen to dispose of such improvements shall,

before the valuation at which the improvements may be sold, be determined under such regulations as the Secretary of the Interior may prescribe."

The plaintiff relies upon section 21 of the act of Congress approved July 21, 1902, known as the Cherokee Treaty (32 St. at L. 716, c. 1375):

"Allotment certificates issued by the Dawes Commission shall be conclusive evidence of the right of an allottee to the tract of land described therein, and the United States Indian Agent for the Union Agency shall, under the direction of the Secretary of the Interior, upon the application of the allottee, place him in possession of his allotment, and shall remove therefrom all persons objectionable to him, and the acts of the Indian agent hereunder shall not be controlled by the writ or process of any court."

And upon section 69 of the same act, which is as follows:

"After the expiration of nine months after the date of the original selection of an allotment by or for any citizen of the Cherokee Tribe as provided in this act, no contest shall be instituted against such selection, and as early thereafter as practicable patents shall issue therefor."

The first proposition urged is that the petition does not state facts sufficient to constitute a cause of action. It is the law that a petition seeking to establish a trust, based on the erroneous action of the department, must set forth with particularity the acts of the department, including the evidence on which it acted, where its findings on a question of fact is material. *Quinby v. Conlon*, 104 U. S. 420, 26 L. Ed. 800; *James v. Germania Iron Co.*, 107 Fed. 597, 46 C. C. A. 476; *Ross v. Stewart*, 25 Okla. 611, 106 Pac. 870; *Citizens' Trading Co. v. Bass*, 30 Okla. 747, 120 Pac. 1095. But this petition goes far enough. It discloses that she filed on the land and received a certificate of allotment; that the certificate was canceled without notice to her and after it had been agreed between her and Miss Swannock that plaintiff should have the land, and also shows that she was in possession of the land April 21, 1904, and that she had been in possession for more than a year prior thereto.

The law as well as equity is with the plaintiff in this case. She took possession of the land more than a year prior to the 21st of April, 1904, when the act was passed giving the Dela-

wares the right to sell the improvements upon their surplus holdings. In fact, her testimony is that she had been in possession much longer. The land had not been segregated by the Act of July 21, 1902. It was the purpose of section 23 of the act to preserve the rights of the Delaware Indians of the Cherokee Nation, but it was not the intention of Congress to delay the allotment of the Cherokees. It was intended to preserve the rights of the Delawares by segregation enough to fulfill the stipulations of their agreement with the Cherokees, but it was intended that the balance of the lands should be subject to allotment as soon as the rolls were completed. This segregation was to include lands selected and occupied by the Delawares. Outside of this segregation the land was subject to allotment. Doubtless the department would have reserved the particular tract from allotment had it been notified by Miss Swannock that she owned the improvements thereon. That was the rule of the department in all cases, even among members of the same tribe; but, where no notice was given and the land was filed, the certificate became conclusive after nine months, especially when the owner of the improvements did not desire to file in his name or the name of a member of his family. It cannot be believed that Congress meant by Act April 21, 1904, to deprive members of the Cherokee Tribe of allotments lawfully made by them on lands subject to allotment at the time it was allotted, and of which they had taken possession. The purpose was only to permit the Delawares to dispose of improvements of which they were in possession at the time the act was passed. It could not be an injustice to any one to permit the Delawares to dispose of improvements of which they had retained possession, but where they had, as in this case, surrendered possession of the unsegregated land, and had permitted it to be filed on by members of the Cherokee Tribe, great injustice might result, as in this case, by canceling the filing. Congress did not intend by Act April 21, 1904, nor by Act March 3, 1905, to disturb filings lawful at the time they were made. In this case the plaintiff had not perpetrated a fraud on any one. The land was not segregated for the Delawares. She took possession without any objections from Miss Swannock, or any one repre

senting her, so far as appears from the record. She leased the land for oil and gas purposes, and her lease was approved by the department. Miss Swannock must have known that she was in possession by her lessee, but never at any time objected to the possession of the lessee. If she had any rights under the Act of 1902, she should have asserted them before the expiration of nine months from the time of filing. Of course, if the plaintiff had concealed her filing until after the expiration of nine months, a different question might arise. When the certificate was issued and the nine months had elapsed, the certificate was conclusive except for fraud. In *Ballinger v. Frost*, 216 U. S. 240, 30 Sup. Ct. 338, 54 L. Ed. 464, Mr. Justice Brewer said:

"Whenever, in pursuance of the legislation of Congress, rights have become vested, it becomes the duty of the courts to see that those rights are not disturbed by any action of an executive officer, even the Secretary of the Interior, the head of a department. However laudable may be the motives of the Secretary, he, as all others, is bound by the provisions of congressional legislation. It must be borne in mind that this allotment provided by Congress contemplated a distribution among the Choctaw and Chickasaw Indians of the lands that belonged to them in common. They were the principal beneficiaries, and their title to the land they selected should be protected against the efforts of outsiders to secure them. White men settling on town sites were not the principal beneficiaries. Congress, it is true, authorized town sites, and the town of Mill Creek was established in compliance with the statute. It further provided for an enlargement of any town site upon the recommendation of the Commission to the Five Civilized Tribes. That recommendation was made in respect to the town of Mill Creek, but disapproved by the Secretary of the Interior. Thereafter the relator selected the land in controversy, a tract of 40 acres, on which were her improvements. Notice was given as required, and the time in which contest could be made—nine months—elapsed. Thereupon, as provided by the statute, the title of the allottee to the land selected became fixed and absolute, and the chief authorities of the Choctaw and Chickasaw Nations executed to her a patent, as required, of the land selected. The fact that there may have been persons on the land is immaterial. They were given nine months to contest the right of the applicant. They failed to make contest, and her rights became fixed. Thereafter the Secretary of the Interior had nothing but the ministerial duty of see-

ing that a patent was duly executed and delivered."

In *Garfield v. U. S. ex rel. Goldsby,* 211 U. S. 249, 29 Sup. Ct. 62, 53 L. Ed. 168, which was a mandamus proceeding to compel the Secretary of the Interior to replace on the rolls a person who had been enrolled and whose name the Secretary had stricken from the rolls without notice to him, Mr. Justice Day said:

"By the conceded action of the Secretary prior to the striking of Goldsby's name from the rolls he had not only become entitled to participate in the distribution of the funds of the nation, but by the express terms of section 23 of the Act of July 1, 1902 (32 St. at L. 641, c. 1362), it was provided that the certificate should be conclusive evidence of the right of the allottee to the tract of land described therein. We have therefore under consideration in this case the right to control by judicial action an alleged unauthorized act of the Secretary of the Interior for which he was given no authority under any act of Congress."

The recent case of *U. S. ex rel. Knight v. Lane,* 228 U. S. 6, 33 Sup. Ct. 407, 57 L. Ed. 709, decided March 17, 1913, was a mandamus proceeding to compel the Secretary of the Interior to issue a patent. In that case application to cancel a filing was made within 30 days after the filing, and the person whose filing was canceled had notice and appeared at the hearing. The mandamus was refused, but in the course of the opinion Mr. Justice Van Devanter said:

"The decisions in *Garfield v. United States,* 211 U. S. 249, 29 Sup. Ct. 62, 53 L. Ed. 168, are not in conflict with the views here expressed. In the former the writ was awarded to compel the respondent to erase and disregard an entry which he arbitrarily and without notice had caused to be made upon a public record, thereby beclouding the relator's right to an Indian allotment. In the latter the writ was awarded to compel the delivery of a patent which was withheld solely through the unauthorized action of the Secretary in entertaining and sustaining a proceeding in the nature of a contest after the expiration of the time limited by statute for instituting such a proceeding."

See, also, *Wallace v. Adams,* 74 C. C. A. 540, 143 Fed. 716, as to the effect of an allotment certificate. Unless the plaintiff recovers in this case, a grave injustice will be done. Not only did she file on the land, but long after the nine months for con-

test had expired she leased the land for oil and gas purposes. This lease was approved by the Secretary of the Interior, and the lessee entered on the land without objection from Miss Swannock. In fact, a reading of the entire record leads to the conclusion that she was willing for the plaintiff to have the land. The fact that she subsequently gave a bill of sale has very little significance. She knew nothing of the technical descriptions. The lessee bored wells and paid the plaintiff $2,100 in royalties which she now owes some one if her allotment was rightfully canceled. The department took the position that plaintiff and Miss Swannock could not lawfully make any agreement about the improvements, and that, if plaintiff paid $200 for permission to file the improvements, she obtained no rights thereby, for the reason that the improvements had not been valued as required by the act. But it would seem the improvements were subsequently valued at $12 and sold for that. It would seem that the maxim *"De minimis non curat lex,"* would almost be sufficient to prevent the canceling of an allotment and the destruction of vested interests, such as existed in this case for so slight a consideration. The holding that she could not for sixteen times their value give plaintiff the right to file on her improvements without complying with the regulations of the department, but when she had complied could give the right to another for an insignificant sum, is simply in line with the policy of the department, which, though probably necessary, has made it so extremely unpopular in the Indian Territory.

The judgment should be affirmed.

By the Court: It is so ordered.