## DELAWARE TRIBAL BUSINESS COMMITTEE
### ET AL. *v.* WEEKS ET AL.

No. 75–1301.  Argued November 10, 1976—Decided February 23, 1977*

---

*Together with No. 75–1335, *Absentee Delaware Tribe of Oklahoma Business Committee et al.* v. *Weeks et al.*, and No. 75–1495, *Andrus, Secretary of the Interior, et al.* v. *Weeks et al.*, also on appeal from the same court; and No. 75–1328, *Weeks et al.* v. *Andrus, Secretary of the Interior, et al.*, also on appeal from the same court but not argued.  See n. 16, *infra.*

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined and in Parts I and II of which BURGER, C. J., and BLACKMUN, J., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the result, in which BURGER, C. J., joined, *post*, p. 90. STEVENS, J., filed a dissenting opinion, *post*, p. 91.

*George B. Christensen* argued the cause for appellants in No. 75-1301. With him on the briefs were *Joseph Fontana*

and *Bruce Miller Townsend. Bernard J. Rothbaum, Jr.,* argued the cause and filed briefs for appellants in No. 75–1335. *Deputy Solicitor General Randolph* argued the cause for appellants in No. 75–1495. With him on the brief were *Solicitor General Bork, Assistant Attorney General Taft, Kenneth S. Geller, Edmund B. Clark,* and *Edward J. Shawaker.*

*Delmar L. Stagner* argued the cause for appellees in all cases. With him on the brief was *Stephen P. Friot.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

An Act of Congress providing for distribution of funds to certain Delaware Indians, pursuant to an award by the Indian Claims Commission to redress a breach by the United States of an 1854 treaty, is challenged in this action by a group of Delawares excluded from the distribution. The question presented by this litigation is whether their exclusion denies them equal protection of the laws in violation of the Due Process Clause of the Fifth Amendment.[1]

I

A brief history of the migrations of the Delaware Indians will serve as a helpful backdrop to the litigation.[2] The Delawares originally resided in the Northeastern United States, in what are now southern New York, New Jersey, part of Pennsyl-

---

[1] Fifth Amendment equal protection claims are cognizable under the Amendment's Due Process Clause. *Schneider v. Rusk,* 377 U. S. 163, 168 (1964); *Bolling v. Sharpe,* 347 U. S. 497, 499 (1954). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U. S. 1, 93 (1976).

[2] A more detailed narrative of the Delawares' history and westward migrations may be found in *Delaware Tribe of Indians v. United States,* 2 Ind. Cl. Comm. 253, 255–261 (1952), and in the opinion of the District Court below, *Weeks v. United States,* 406 F. Supp. 1309 (WD Okla. 1975). See also S. Rep. No. 1518, 90th Cong., 2d Sess., 7–12 (1968); C. Weslager, The Delaware Indians (1972); M. Wright, A Guide to the Indian Tribes of Oklahoma 145–155 (1977).

vania, and part of Delaware. The Munsee Indians, related to the Delawares, resided in the northern part of that area. Under pressure from new settlers, both the Delawares and the Munsees were gradually forced to move westward, and by 1820 they were geographically scattered. During the trek westward the main branch of the Delawares stopped for varying lengths of time in what are now Ohio, Indiana, and Missouri, while others went to Arkansas, Oklahoma, and Texas. In 1818, the Delawares in Indiana ceded their lands in that State to the United States in return for a promise of land west of the Mississippi River.[3] The Delawares then moved to Missouri for a short time, but under an 1829 "supplementary article" to the 1818 treaty, were again moved to what they were told would be their permanent residence on a reservation in Kansas.[4] The establishment of this reservation was purportedly the fulfillment of the promise made in the 1818 treaty to provide western land in return for their agreement to leave their Indiana lands.

Some Delawares, however, never joined the main body of the Delawares on the Kansas reservation. Among these was a small group that migrated to Oklahoma and settled with the Wichita and Caddo Indians. For a time during the 1850's and 1860's, the Delawares in Kansas expected this group to rejoin the main body of the tribe there, but these Indians, called the "Absentee Delawares" in this suit, stayed with the Wichitas and Caddos.[5] Their descendants

---

[3] Treaty of 1818, 7 Stat. 188.

[4] Treaty of 1829, 7 Stat. 327.

[5] Article IV of the Treaty of 1860 between the United States and the main body of the Delawares, 12 Stat. 1330, provided:

"Whereas some years ago a good many of the Delawares went down among the Southern Indians, and as there are still about two hundred of them there, and as they have reason to believe they will return soon, it is hereby agreed that eighty acres each be set apart for them, to be allotted to them as they return . . . ."

have remained in Oklahoma through the present day, and are a federally recognized Indian tribe.[6]

By the 1850's, the main body of the Delaware Nation, together with a small number of Munsees, had assembled on the "permanent" reservation in Kansas at the confluence of the Kansas and Missouri Rivers. But the hope that the Kansas reservation would be the Delawares' last stopping place was short-lived. In 1866, the Delawares living on the reservation signed a treaty, under which they were to move to "Indian Country" in Oklahoma to live with the Cherokees.[7] Each Delaware moving to Indian Country and enrolling on the proper register was to receive a life estate of 160 acres of Cherokee land and the right to become a member of the Cherokee Nation. Most of the Delawares on the Kansas reservation accepted these conditions and moved to Oklahoma, where they were gradually assimilated for most purposes into the Cherokee Nation, and were permitted to share equally with the Cherokees in the general funds of that tribe. See, *e. g., Delaware Indians v. Cherokee Nation,* 193 U. S. 127 (1904); *Cherokee Nation v. Journeycake,* 155 U. S. 196 (1894). Despite their association with the Cherokees, these Indians, called "Cherokee Delawares" in this suit, have over the years maintained a distinct group identity, and they are today a federally recognized tribe.[8]

---

[6] The formal name of the Absentee Delawares is the Absentee Delaware Tribe of Western Oklahoma. Appellees concede that the Absentee Delawares are a federally recognized tribe. Jurisdictional Statement in No. 75–1328, p. 20.

[7] Treaty of 1866, 14 Stat. 793.

[8] The formal name of the Cherokee Delawares is the Delaware Tribe of Indians. Appellees contend that the Cherokee Delawares were not a federally recognized tribe until after the commencement of this lawsuit. Tr. of Oral Arg. 58–59. The District Court made no finding as to the Cherokee Delawares' status as a recognized tribe, but it is clear that Congress, prior to the enactment of the statute, had dealt with the

The 1866 treaty did not require all Delawares on the Kansas reservation to move to Oklahoma. Rather, the treaty provided that any Delawares who agreed to "dissolve their relations with their tribe" and become citizens of the United States might elect to remain in Kansas. Such Delawares would receive 80 acres of land in Kansas in fee simple and a "just proportion" of the tribe's credits "then held in trust by the United States," but thereafter could not "further participate in their [tribal] councils, nor share in their property or annuities."[9] Twenty-one adult Delawares chose to accept these conditions and remain in Kansas.[10] Their descendants, called "Kansas Delawares" in this suit, are not a federally recognized tribe.[11]

In 1854, while they still lived on the Kansas reservation, the main body of the Delawares signed a treaty with the

---

Cherokee Delawares as a distinct entity. See, e. g., Act of 1904, § 21, 33 Stat. 222, providing for payments to "the Delaware tribe of Indians residing in the Cherokee Nation, as said tribe shall in council direct . . ."; 43 Stat. 812; 44 Stat. 1358; and 49 Stat. 1459, amending 43 Stat. 812.

[9] 14 Stat. 793, Arts. III, IX.

[10] These 21 adults had 49 children who, under the terms of the 1866 treaty, were permitted to elect for themselves upon attaining majority whether to join the Delawares who had moved to the Cherokee Nation. Under an 1874 treaty, however, the minor children were all granted citizenship in the United States, and were granted land on the same terms as their parents. 18 Stat. 146, 175. The District Court found that the 1874 treaty eliminated the necessity for an election by the children. 406 F. Supp., at 1320.

[11] Appellees stated at oral argument in this Court that a Kansas Delaware, Mr. Joe Bartles, was prominently involved in prosecuting the Delawares' claims before the Indian Claims Commission, that two Kansas Delawares had served as members of the (Cherokee) Delaware Tribal Business Committee, and that the Business Committee in 1952 adopted a resolution recognizing a number of Kansas Delawares as entitled to share in Delaware lands. Tr. of Oral Arg. 59–61. There were apparently no Kansas Delawares on the Business Committee during Congress' deliberations on the statute to distribute the award to redress the breach of the 1854 treaty.

United States under which the United States was to sell certain reservation tribal "trust" lands at public auction. In 1856 and 1857, the United States breached the treaty by selling the lands privately and not at public auction. Approximately 100 years later, the Cherokee and Absentee Delawares brought separate but identical claims before the Indian Claims Commission arising out of this breach of the 1854 treaty. The Commission found that the two groups were "entitled jointly to represent the entire Delaware Tribe," *Absentee Delaware Tribe of Oklahoma* v. *United States,* 21 Ind. Cl. Comm. 344, 345 (1969), citing *Delaware Tribe* v. *United States,* 2 Ind. Cl. Comm. 253 (1952), aff'd as to parties, 130 Ct. Cl. 782, 128 F. Supp. 391 (1955), and determined that the private sales of the trust lands had realized $1,385,-617.81 less than would have been realized for the tribe at public auction. The Commission awarded the tribe that sum plus interest, or a total of $9,168,171.13.[12] 21 Ind. Cl. Comm., at 369–370. Congress appropriated funds to pay the award and later enacted Pub. L. 92–456 providing for its distribution.[13]

---

[12] It is not disputed that the credits "then held in trust by the United States" which were distributed proportionately to the Kansas Delawares under the 1866 treaty included the amount received by the United States when it sold the trust lands privately rather than at public auction. We may assume that compliance by the United States with its promise to sell the lands at public auction would have meant that the sum paid to each Kansas Delaware who bought out of the tribe would have been larger.

[13] Pub. L. 92–456, 86 Stat. 762, is codified in 25 U. S. C. §§ 1291–1297 (1970 ed., Supp. V) as follows:

§ 1291:

"The funds appropriated by the Act of December 26, 1969 (83 Stat. 447, 453), to pay a judgment in favor of the petitioners, the Delaware Tribe of Indians in docket 298, and the Absentee Delaware Tribe of Western Oklahoma, and others, in docket 72, together with any interest thereon, after payment of attorney fees, litigation expenses, and such

80

The statute limited distribution to the Cherokee and Absentee Delawares, with amounts payable determined under a formula provided in 25 U. S. C. § 1294. Ten percent of the

expenses as may be necessary in effecting the provisions of sections 1291 to 1297 of this title, shall be distributed as provided in such sections."

§ 1292:

"The Secretary of the Interior shall prepare a roll of all persons who meet the following requirements:

"(a) they were born on or prior to and were living on October 3, 1972; and

"(b) they are citizens of the United States; and

"(c)(1) their name or the name of a lineal ancestor appears on the Delaware Indian per capita payroll approved by the Secretary on April 20, 1906, or

"(2) their name or the name of a lineal ancestor is on or is eligible to be on the constructed base census roll as of 1940 of the Absentee Delaware Tribe of Western Oklahoma, approved by the Secretary."

§ 1293:

"All applications for enrollment must be filed either with the Area Director of the Bureau of Indian Affairs, Muskogee, Oklahoma, or with the Area Director of the Bureau of Indian Affairs, Anadarko, Oklahoma, on or before the last day of the fourth full month following October 3, 1972, and no application shall be accepted thereafter. The Secretary of the Interior shall give a rejection notice within sixty days after receipt of an application if the applicant is ineligible for enrollment. An appeal from a rejected application must be filed with the Area Director not later than thirty days from receipt of the notice of rejection. The Secretary shall make a final determination on each appeal not later than sixty days from the date it is filed. Each application and each appeal filed with the Area Director shall be reviewed by a committee composed of representatives of the two Oklahoma Delaware groups prior to submission of the application or appeal to the Secretary, and the committee shall advise the Area Director in writing of its judgment regarding the eligibility of the applicant."

§ 1294:

"(a) The Secretary of the Interior shall apportion to the Absentee Delaware Tribe of Western Oklahoma, as presently constituted, so much of the judgment fund and accrued interest as the ratio of the persons enrolled pursuant to section 1292 (c)(2) of this title bears to the total number of persons enrolled pursuant to section 1292 of this title. The

total sum was to be set aside for the two tribal bodies, and was to be retained by the United States to the credit of the tribes, to be used in ways approved by the Secretary

funds so apportioned to the Absentee Delaware Tribe of Western Oklahoma shall be placed to the credit of the tribe in the United States Treasury and shall be used in the following manner: 90 per centum of such funds shall be distributed in equal shares to each person enrolled pursuant to section 1292 (c)(2) of this title, and 10 per centum shall remain to the credit of the tribe in the United States Treasury, and may be advanced, expended, invested, or reinvested for any purpose that is authorized by the tribal governing body and approved by the Secretary of the Interior.

"(b) The funds not apportioned to the Absentee Delaware Tribe of Western Oklahoma shall be placed to the credit of the Delaware Tribe of Indians in the United States Treasury and shall be used in the following manner: 90 per centum of such funds shall be distributed in equal shares to each person enrolled pursuant to section 1292 (c)(1) of this title, and 10 per centum shall remain to the credit of the tribe in the United States Treasury and may be advanced, expended, invested, or reinvested for any purpose that is authorized by the tribal governing body: *Provided,* That the Secretary of the Interior shall not approve the use of the funds remaining to the credit of the tribe until the tribe has organized a legal entity which in the judgment of the Secretary adequately protects the interests of its members."

§ 1295:

"Sums payable to living enrollees age eighteen or older or to heirs or legatees of deceased enrollees age eighteen or older shall be paid directly to such persons. Sums payable to enrollees or their heirs or legatees who are under age eighteen or who are under legal disability other than minority shall be paid in accordance with such procedures, including the establishment of trusts, as the Secretary of the Interior determines appropriate to protect the best interests of such persons."

§ 1296:

"None of the funds distributed per capita under the provisions of sections 1291 to 1297 of this title shall be subject to Federal or State income taxes."

§ 1297:

"The Secretary of the Interior is authorized to prescribe rules and regulations to carry out the provisions of sections 1291 to 1297 of this title."

of the Interior. The remaining 90% was to be divided among Cherokee Delawares whose names appeared on a "per capita payroll" described in § 1292 (c)(1), and among Absentee Delawares whose names appeared on a "constructed base census roll" described in § 1292 (c)(2).[14]

Appellee Weeks, on behalf of all the Kansas Delawares, instituted this action against the United States, the Cherokee Delawares, the Absentee Delawares, and the Secretary of the Interior in the District Court for the Western District of Oklahoma, alleging that the exclusion of the Kansas Delawares from the distribution of the award constituted a denial of the equal protection of the laws guaranteed by the Due Process Clause of the Fifth Amendment. A three-judge court was convened.[15] The court declared, one judge dissenting, that Congress' failure to include the Kansas Delawares among those entitled to share in the award under Pub. L. 92–456 violated the Due Process Clause. The court also enjoined the Secretary of the Interior from distributing any of the appropriated funds pending amendment of the distribution provisions of the statute, or enactment of further legislation providing for distribution of the funds. *Weeks* v. *United States,* 406 F. Supp. 1309, 1346–1347 (1975). Each defendant separately appealed to this Court, the Secretary of the Interior in No. 75–1495, the Cherokee Delawares in No. 75–1301, and the Absentee Delawares in No. 75–1335. We

---

[14] So defined, Cherokee Delawares eligible to share in the distribution must necessarily be members of the tribal entity as presently constituted. Absentee Delawares eligible to share in the award, on the other hand, are defined somewhat more broadly, so that some nonmembers of the tribe are eligible under the statute.

[15] A similar action in the District Court for the Northern District of Oklahoma was consolidated with appellee Weeks' suit in the District Court below, and the appeals to this Court are from the decision in the consolidated cases.

noted probable jurisdiction of the three appeals, 426 U. S. 933 (1976). We reverse.[16]

## II

Appellants differ on the issue of whether this suit presents a nonjusticiable political question because of Congress' pervasive authority, rooted in the Constitution, to control tribal property. Stated in other words, they differ on the issue of whether congressional exercise of control over tribal property is final and not subject to judicial scrutiny, since the power over distribution of tribal property has "been committed by the Constitution" to the Congress, *Baker* v. *Carr,* 369 U. S. 186, 211 (1962), and since "[t]he nonjusticiability of a political question is primarily a function of the separation of powers," *id.,* at 210. Appellants Cherokee and Absentee Delawares, citing *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 (1903), argue that Congress' distribution plan reflects a congressional determination not subject to scrutiny by the Judicial Branch, and that the District Court therefore erred in reaching the merits of this action. Appellant Secretary of the Interior, on the other hand, submits that the plenary power

---

[16] The United States, also joined as a party defendant, was dismissed from the suit on the ground that it had not consented to the action. No appeal was taken to this Court from that dismissal.

Appellees also filed an appeal from the District Court judgment which is pending as *Weeks* v. *Andrus,* No. 75–1328. Their complaint asserted that 25 U. S. C. §§ 1181–1186 (relating to the 1818 treaty) and §§ 1291–1297 (1970 ed., Supp. V) (relating to the 1854 treaty) violated the Fifth Amendment's Due Process and Just Compensation Clauses; §§ 1181–1186, because the Cherokee Delaware class was wrongfully included in the proposed distribution under that statute; and §§ 1291–1297, because the Kansas Delaware class was wrongfully excluded and the Cherokee and Absentee Delaware classes wrongfully included in that statute's distribution. The District Court held that neither statute was unconstitutional by reason of the inclusion of the Cherokee Delaware and the Absentee Delaware classes. It is from this aspect of the District Court's decision that the appeal in No. 75–1328 is taken. In light of today's decision, the judgment of the District Court in that respect is affirmed.

of Congress in matters of Indian affairs "does not mean that all federal legislation concerning Indians is . . . immune from judicial scrutiny or that claims, such as those presented by [appellees], are not justiciable." Brief for Appellants in No. 75–1495, p. 19 n. 19. We agree with the Secretary of the Interior.

The statement in *Lone Wolf, supra,* at 565, that the power of Congress "has always been deemed a political one, not subject to be controlled by the judicial department of the government," however pertinent to the question then before the Court of congressional power to abrogate treaties, see generally *Antoine* v. *Washington,* 420 U. S. 194, 201–204 (1975), has not deterred this Court, particularly in this day, from scrutinizing Indian legislation to determine whether it violates the equal protection component of the Fifth Amendment. See, *e. g., Morton* v. *Mancari,* 417 U. S. 535 (1974). "The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute." *United States* v. *Alcea Band of Tillamooks,* 329 U. S. 40, 54 (1946) (plurality opinion); see also *United States* v. *Creek Nation,* 295 U. S. 103, 109–110 (1935); cf. *United States* v. *Jim,* 409 U. S. 80, 82 n. 3 (1972).

The question is therefore what judicial review of Pub. L. 92–456 is appropriate in light of the broad congressional power to prescribe the distribution of property of Indian tribes. The general rule emerging from our decisions ordinarily requires the judiciary to defer to congressional determination of what is the best or most efficient use for which tribal funds should be employed. *Sizemore* v. *Brady,* 235 U. S. 441, 449 (1914). Thus, Congress may choose to differentiate among groups of Indians in the same tribe in making a distribution, *Simmons* v. *Seelatsee,* 384 U. S. 209 (1966), aff'g 244 F. Supp. 808 (ED Wash. 1965), or on the other hand to expand a class of tribal beneficiaries entitled to share in royalties from tribal lands, *United States* v. *Jim,*

*supra,* or to devote to tribal use mineral rights under allotments that otherwise would have gone to individual allottees, *Northern Cheyenne Tribe* v. *Hollowbreast,* 425 U. S. 649 (1976). The standard of review most recently expressed is that the legislative judgment should not be disturbed "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians . . . ." *Morton* v. *Mancari, supra,* at 555.

### III

We are persuaded on the record before us that Congress' omission of the appellee Kansas Delawares from the distribution under Pub. L. 92–456 was "tied rationally to the fulfillment of Congress' unique obligation toward the Indians."

First, the Kansas Delawares are not a recognized tribal entity, but are simply individual Indians with no vested rights in any tribal property. Public Law 92–456 distributes tribal rather than individually owned property, for the funds were appropriated to pay an award redressing the breach of a treaty with a tribal entity, the Delaware Nation. It was that tribal entity, represented jointly in the suit before the Indian Claims Commission by the appellants Cherokee Delawares and Absentee Delawares, that suffered from the United States' breach, and both the Commission award and the appropriation by Congress were the means of compensating that tribal entity for the wrong done to it. Indeed, the Indian Claims Commission is not empowered to hear individuals' claims, but may only adjudicate claims held by an "Indian tribe, band, or other identifiable group." 25 U. S. C. §§ 70a, 70i; see *Minnesota Chippewa Tribe* v. *United States,* 161 Ct. Cl. 258, 270–271, 315 F. 2d 906, 913–914 (1963). As tribal property, the appropriated funds were subject to the exercise by Congress of its traditional broad authority over the management and distribution of lands and property held by recognized tribes, an authority "drawn both explicitly and implicitly from the Constitution itself." *Morton* v. *Mancari,*

*supra,* at 551–552. This authority of Congress to control tribal assets has been termed "one of the most fundamental expressions, if not the major expression, of the constitutional power of Congress over Indian affairs . . . ." F. Cohen, Handbook of Federal Indian Law 94, 97 (1942).

The ancestors of the Kansas Delawares severed their relations with the tribe when they elected under the 1866 treaty to become United States citizens entitled to participate in tribal assets only to the extent of their "just proportion . . . of the cash value of the credits of said tribe . . . *then* held in trust by the United States." (Emphasis supplied.) We cannot say that the decision of Congress to exclude the descendants of individual Delaware Indians who ended their tribal membership and took their proportionate share of tribal property as constituted more than a century ago, and to distribute the appropriated funds only to members of or persons closely affiliated with the Cherokee and Absentee Delaware Tribes, was not "tied rationally to the fulfillment of Congress' unique obligation toward the Indians."

Second, the exclusion of the Kansas Delawares under Pub. L. 92–456 was not their first exclusion from participation in a distribution of tribal assets. In 1904 Congress appropriated $150,000 to settle claims of the Delaware Tribe of Indians, one of them arising out of another injustice done to the Delawares under the 1854 treaty, unrelated to the breach which forms the basis for the distribution under Pub. L. 92–456.[17] See *United States* v. *Delaware Tribe of Indians,* 192 Ct. Cl. 385, 403–405, 427 F. 2d 1218, 1229–1230 (1970). The 1904 Act directed the Secretary of the Treasury to pay the settlement to the tribe known in this suit as the Cherokee Delawares "as said tribe shall in council direct," thereby excluding both

---

[17] The claims had been brought by the Cherokee Delawares under a 1902 Act, 32 Stat. 716, 726, which, *inter alia,* gave jurisdiction to the Court of Claims to hear claims brought by the "Cherokee tribe, or any band thereof . . . against the United States."

Absentee and Kansas Delawares. 33 Stat. 189, 222. This distribution was limited to the Cherokee Delawares although it was compensation, *inter alia*, for a wrong to the Delawares in 1854, before the Kansas Delawares split off from the tribe. Some Kansas Delawares unsuccessfully sought to participate in the distribution but, as noted by the District Court in this case, "were denied participation on grounds similar to some of those argued in the present case." 406 F. Supp., at 1321 n. 15. The Comptroller of the Treasury concluded that "[m]anifestly [the Kansas Delawares] were not entitled to participate in the distribution of annuities or other funds due or belonging to the Delaware tribe" for:

"The provision in the [A]ct of April 21, 1904, *supra,* authorizes and directs payment to the 'Delaware *tribe* of Indians residing in the Cherokee Nation, as said *tribe* shall in council direct' . . . . The proviso immediately following the appropriation in the [A]ct emphasizes the clear indication that the appropriation was made for the tribe as distinguished from the Delaware Indians who had severed their tribal relations and become citizens of the United States." 11 Comp. Dec. 496, 500 (1905) (emphasis in original).

While this precedent of excluding the Kansas Delawares from the 1904 distribution does not of itself legitimate their exclusion from the present distribution statute, their earlier exclusion nevertheless indicates that Congress has historically distinguished them from the Cherokee Delawares in distributing an award based in part on a breach of the very treaty involved in this litigation.

Third, Congress deliberately limited the distribution under Pub. L. 92-456 to the Cherokee and Absentee Delawares because of substantial problems it apprehended might attend a wider distribution. H. R. 5200, the bill originally introduced to distribute the funds, had contained a "catchall" clause authorizing distribution "to include the names of all

persons born on or prior to and living on the date of this Act who are lineal descendants of members of the Delaware Tribe as it existed in 1854 . . . ." [18]   This catchall would have been analogous to a clause in a 1968 statute distributing funds to compensate the Delaware Tribe for the United States' inadequate payment to them when they were moved off their Indiana lands in 1818.[19]   Under the 1968 catchall clause, all lineal descendants of the tribe as it existed in 1818 were permitted to share in the distribution, 25 U. S. C. § 1181 (d), and about 300 Kansas Delawares were thereby allowed to participate in the distribution of the award redressing the 1818 wrong.

The omission of the catchall provision from Pub. L. 92–456, as finally enacted, followed legislative hearings at which the Cherokee and Absentee Delawares testified.   At these hearings they directed Congress' attention to problems that had arisen when Munsee Indians, in addition to the Kansas Delawares, had claimed eligibility under the catchall provision of the 1968 statute.[20]   Because of a dispute over the eligibility of the Munsees to participate under the catchall clause, there had been inordinate delays in the distribution of the funds.   Indeed, as late as 1972 many of the Munsees' claims

[18] H. R. 5200, 92d Cong., 1st Sess., 2 (1971); S. 1067, 92d Cong., 1st Sess., 2 (1971).

[19] 82 Stat. 861, 25 U. S. C. §§ 1181–1186.   The constitutionality of this statute was also challenged by appellees in the District Court.   See n. 16, *supra*.

[20] Hearings on H. R. 5200 before the Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs, 92d Cong., 2d Sess. (Mar. 13, 1972) (unpublished); Hearings on H. R. 5200, H. R. 14267 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 92d Cong., 2d Sess. (May 8, 1972) (unpublished); Hearings on H. R. 14267, H. R. 5200 before the House Committee on Interior and Insular Affairs, 92d Cong., 2d Sess. (May 10, 1972) (unpublished); Hearings on S. 3113, S. 1067, S. 2249 and S. 2298 before the Subcommittee on Indian Affairs of the Senate Committee of Interior and Insular Affairs, 92d Cong., 2d Sess., 60 *et seq.* (July 21, 1972) (unpublished).

were still unresolved, and distribution under the 1968 statute was virtually paralyzed. Hearings on H. R. 5200 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 92d Cong., 2d Sess., 12, 22, 59, 79, 97, 105–106, 113 (Mar. 13, 1972) (unpublished).

We recognize, as did the District Court, that Congress omitted the catchall provision from the present statute in order to avoid a repetition of the problems with the Munsees, and that Congress was not "made aware that the limitation of distribution to [the Cherokee and Absentee Delawares] would exclude a group which had lived on the Kansas Delaware lands and which could trace their Delaware descendancy as the Kansas Delawares do." 406 F. Supp., at 1332.[21] But we do not conclude from Congress' ignorance of the effect of the elimination of the catchall on the Kansas Delawares that the statute is therefore irrational. Congress chose to limit distribution of the award to the Cherokee and the Absentee Delawares, in whose names the Delawares' claims had been prosecuted before the Indian Claims Commission, and whom the Commission had found to represent the interests of all the Delawares. Regardless of Congress' knowledge of the effect of this limitation on the Kansas Delawares, we cannot say that the congressional choice, though predicated upon the Munsee experience under the 1968 statute, does not rationally support its decision to avoid undue delay, administrative difficulty, and potentially unmeritorious claims by distributing the award only to the Cherokee and Absentee Delawares.[22]

---

[21] It seems apparent from the Senate and House Reports accompanying the bill that was eventually enacted that Congress was not made aware of the Kansas Delawares' existence, for the Reports state that the beneficiaries of the distribution will be the "[l]iving descendants of members of the Delaware Tribe as it existed in 1854." S. Rep. No. 92–1126, p. 6 (1972); H. R. Rep. No. 92–1081, p. 6 (1972).

[22] The congressional decision to distribute funds only to individuals who were members of, or clearly identified with, specific tribes has

## IV

Our conclusion that the exclusion of the Kansas Delawares from distribution under Pub. L. 92–456 does not offend the Due Process Clause of the Fifth Amendment of course does not preclude Congress from revising the distribution scheme to include the Kansas Delawares. The distribution authorized by Pub. L. 92–456 has not yet occurred, and Congress has the power to revise its original allocation. *United States* v. *Jim,* 409 U. S., at 82–83.

*Reversed.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring in part and concurring in the result.

I join Parts I and II of the Court's opinion, but otherwise I concur only in the result.

For me, the reversal of the District Court's judgment is not a result that is so inevitable and so easily and smoothly reached as a reading of Part III of the Court's opinion makes it appear. The Court's justifications for exclusion of the Kansas Delawares are not very persuasive. The first— favoritism toward tribal Indians—is undermined by the fact that Absentee Delawares who are not members of that tribe nevertheless are entitled to participate. *Ante,* at 82 n. 14. The second—exclusion from a prior distribution—is troublesome because it is difficult for me to see how perceived prior unfair treatment buttresses further unfairness. And I wonder about the statement, *ante,* at 87, that Congress "has his-

---

precedent in other similar statutes. See, *e. g.,* 25 U. S. C. §§ 565–565g (Klamath); 25 U. S. C. §§ 581–590c (1970 ed., Supp. V) (Shoshone and Shoshone-Bannock); 25 U. S. C. §§ 1071–1073 (1970 ed. and Supp. V) (Confederated Colville); 25 U. S. C. §§ 1161–1167 (1970 ed. and Supp. V) (Cheyenne-Arapaho); 25 U. S. C. §§ 1191–1195 (Confederated Umatilla); 25 U. S. C. §§ 1261–1265 (1970 ed., Supp. V) (Blackfeet and Gros Ventre); 25 U. S. C. §§ 1300b–1300b–5 (1970 ed., Supp. V) (Kickapoo); 25 U. S. C. §§ 1300c–1300c–5 (1970 ed., Supp. V) (Yankton Sioux); 25 U. S. C. §§ 1300e–1300e–7 (1970 ed., Supp. V) (Assiniboine).

torically distinguished" the Kansas Delawares from the Cherokee Delawares in distributing tribal awards, when in fact *both* participated in the 1968 allocation that Congress authorized for the Delawares. The third justification—administrative convenience in eliminating the catchall clause—may have some weight. But, as the opinion acknowledges, *ante,* at 88–89, there was no problem with the Kansas Delawares in the distribution of the 1968 award; the administrative difficulty was only with the Munsees.

Nevertheless, having said all this, I am not persuaded that the Court errs in its conclusion. For me, the case is one of that rare type in which the argument on each side is not at all strong. With the litigation in this lukewarm posture, I conclude that we must acknowledge that there necessarily is a large measure of arbitrariness in distributing an award for a century-old wrong. One could regard the distribution as a windfall for whichever beneficiaries are now favored. In light of the difficulty in determining appropriate standards for the selection of those who are to receive the benefits, I cannot say that the distribution directed by the Congress is unreasonable and constitutionally impermissible. Congress must have a large measure of flexibility in allocating Indian awards, and what it has done here is not beyond the constitutional pale.

Mr. Justice Stevens, dissenting.

At the outset of these proceedings the Indian Claims Commission noted that in accordance with the Indian Claims Commission Act any recovery for a breach of the treaties of 1829 and 1854 "must be for the benefit of all the descendants of the Delaware Nation as constituted in 1829 and 1854," *Delaware Tribe of Indians* v. *United States,* 2 Ind. Cl. Comm. 253, 270–271 (1952).[1] In due course the Commission found

---

[1] Aff'd as to parties, 130 Ct. Cl. 782, 128 F. Supp. 391 (1955). The Commission relied on a contemporaneous holding of the Court of Claims to

that the 1854 treaty had been breached in 1856 and 1857 when the United States disposed of the tribal lands in Kansas by private, not public, sale for about half their fair value. The opinion accompanying the judgment of the Commission reiterated that the named plaintiffs "were entitled jointly to represent the entire Delaware Tribe," *Absentee Delaware Tribe of Oklahoma* v. *United States,* 21 Ind. Cl. Comm. 344, 345 (1969). Thereafter, Congress appropriated the amount required by the judgment, 83 Stat. 447, 453, and adopted the distribution statute at issue here, which was intended to satisfy that judgment, 25 U. S. C. §§ 1291–1297 (1970 ed., Supp. V).

Appellees, the "Kansas Delawares," are members of the class represented by the plaintiffs in the Indian Claims Commission proceeding.[2] There is no question about the fact that they are actual lineal descendants of members of the Delaware Tribe of 1854. Nor is there any question about the fact that their exclusion from the distribution statute is the consequence of a malfunction of the legislative process rather than a deliberate choice by Congress. At the urging of appellants Congress adopted an amendment to the bill in order to be sure that descendants of the Munsees—who had not been members of the Delaware Tribe since prior to 1818— would not participate in the award. Unfortunately, the amendment had the unintended consequence of also excluding the Kansas Delawares, whose ancestors were members of

the same effect, *McGhee* v. *Creek Nation,* 122 Ct. Cl. 380, 388, 392, 396 (1952), cert. denied, 344 U. S. 856. That court, charged by statute with interpreting the Indian Claims Commission Act and reviewing the actions of the Commission, 25 U. S. C. § 70s, continues to adhere to this view: "[T]he ancestral group 'owns' the claim, and present-day Indian groups are before the Commission only on behalf of the ancestral entity." *Turtle Mountain Band of Chippewa Indians* v. *United States,* 203 Ct. Cl. 426, 458, 490 F. 2d 935, 954 (1974).

[2] Indeed, a Kansas Delaware was chairman of the plaintiffs' business committee when the suit was filed in the Indian Claims Commission in 1951. Brief for Appellees 22.

the tribe in 1854 and who suffered precisely the same wrong as those whose descendants will share in the award on a per capita basis.[3]

These facts are undisputed. They make it perfectly clear that the special treatment of the Kansas Delawares does not in fact represent any rational attempt at "fulfillment of Congress' unique obligation toward the Indians . . . ." *Morton* v. *Mancari*, 417 U. S. 535, 555. I think it is equally clear that each of the three hypothetical justifications for the exclusion

---

[3] The words "Kansas Delaware" do not appear in the legislative history of 25 U. S. C. §§ 1291–1297 (1970 ed., Supp. V). The court below noted: "There is evidence in our record that at least some of the Cherokee and Absentee Delawares, themselves, were unaware of the existence of the Kansas Delawares at the time they testified before Congress. Mr. Townsend, the chairman of the Delaware Tribal Business Committee (Cherokee Delaware) and one of the principal witnesses before Congress urging the adoption of a distribution scheme utilizing only the 1906 and 1940 rolls, testified in the course of this litigation that he was unaware of the existence of the Kansas Delawares . . . ." *Weeks* v. *United States,* 406 F. Supp. 1309, 1331 n. 29 (WD Okla. 1975).

The District Court conducted an extensive review of the legislative history, *id.,* at 1330–1332, 1347–1351, and concluded:

"[T]he Congress was specifically requested by the Absentee Delawares and the Cherokee Delawares to delete the catchall provision [under which respondents would have claimed], and that Congress made the decision in response to the urging of those groups. On the record before us, we find that neither Congress nor its committees were made aware that the limitation . . . would exclude a group which had lived on the Kansas Delaware lands and which could trace their Delaware descendancy as the Kansas Delawares do. Instead the focus was on the Munsee Indian groups, including the Christian Indians, and paramount consideration was given to the Munsee situation in considering the proposed change in the distribution statute.

". . . It is disturbing that the Congress was apparently not aware of the Kansas Delaware group and we are persuaded that it was not the intent of Congress to exclude a group such as the Kansas Delawares from the distribution." *Id.;* at 1332.

In view of these undisputed findings it is also disturbing that the majority refers to a congressional "decision" to exclude the Kansas Delawares, *ante,* at 86.

of the Kansas Delawares advanced by the majority merely emphasizes the lack of any rational explanation for the legislative malfunction because each of the justifications would, if valid, require a different classification.

First, it is suggested that the Kansas Delawares were properly excluded because they terminated their membership in the tribe before the claim was reduced to judgment. But so did the Cherokees. They ceased being members of the Delaware Tribe in 1867, when they joined the Cherokee Nation.[4] Moreover, some of those who would share in the distribution on behalf of the Absentee Delawares are not members of that tribe.[5] Resignation from the tribe after the time of the wrong does not provide a consistent basis for treating the Kansas Delawares differently from the Cherokees or the Absentees.[6]

---

[4] Articles of Agreement between the Cherokee Nation and the Delaware Tribe, Apr. 8, 1867, quoted in the Statement of the Case in *Cherokee Nation* v. *Journeycake*, 155 U. S. 196, 199–202. The agreement states, in part:

" 'On the fulfilment by the Delawares of the foregoing stipulations, all the members of the tribe registered as above provided, shall become members of the Cherokee Nation, with the same rights and immunities, and the same participation (and no other) in the national funds as native Cherokees, save as hereinbefore provided.

" 'And the children hereafter born of such Delawares so incorporated into the Cherokee Nation, shall in all respects be regarded as native Cherokees.' " *Id.*, at 202.

Aspects of the status of the Cherokee Delawares were adjudicated in *Journeycake* and in *Delaware Indians* v. *Cherokee Nation*, 193 U. S. 127. To be sure the Cherokee Delawares have recently reconstituted themselves as a recognized Indian tribe. This did not occur, however, until 1974, two years after Congress acted on the legislation in question.

[5] A person must have at least one-eighth Delaware blood in order to be recognized as a member of the Absentee Delaware Tribe. No such limitation exists as to the Absentee section of the distribution statute, 25 U. S. C. § 1292 (c) (2) (1970 ed., Supp. V). *Weeks* v. *United States*, 406 F. Supp. 1309, 1339 n. 40.

[6] It would be manifestly unjust to read the treaty of 1866, which led

Second, it is pointed out that the Kansas Delawares did not participate in the $150,000 distribution appropriated by Congress in 1904 to settle a claim arising out of another breach of the 1854 treaty. But neither did the Absentee Delawares. The reason is perfectly clear. The claim involved in that settlement had been asserted pursuant to a special provision in a Cherokee allotment statute designed to resolve all claims which "the Cherokee tribe, or any band thereof, . . . may have against the United States . . . ." 32 Stat. 726. Obviously, only the Cherokee Delawares could qualify as a band of the Cherokee Tribe. That precedent does not provide any basis for treating the Kansas Delawares differently from the Absentee Delawares, or for differentiating among Delawares in a proceeding brought on behalf of all descendants of the Delaware Nation as constituted in 1829 and 1854.[7]

---

to the resignation of the Kansas Delawares, as providing an affirmative justification for depriving their descendants of their rightful share of the recovery based on the proceeds that should have been obtained from the sale of the tribal lands in 1856 and 1857. The 1866 treaty expressly provided that upon becoming a citizen of the United States each member was "entitled to receive a patent in fee-simple, with power of alienation, for the land heretofore allotted to him, and his just proportion, in cash or in bonds, of the cash value of the credits of said tribe, principal and interest, then held in trust by the United States . . . ." 14 Stat. 796.

The 1866 treaty was plainly intended to give the Kansas Delawares their proportionate interest in the proceeds of the sales made pursuant to the 1854 treaty. It is true that those proceeds were only about half as large as they would have been if the United States had fulfilled its treaty obligation, and I recognize that the unknown claim for the balance of the fair value of the tribal land was not technically "then held in trust by the United States." But surely it was the intention of the parties to the 1866 treaty to give the Kansas Delawares their fair share of the credits which should have been on the books as a result of the sale of tribal property as well as their share of the actual credits. See the discussion below, 406 F. Supp., at 1337 n. 39, and accompanying text.

[7] The more relevant precedent is the 1968 statute distributing the proceeds of the award based on the breach of the 1818 treaty, ante, at 88. All Delawares, including the Kansas Delawares, who traced their ancestry

Third, it is said that the amendment excluding the Kansas Delawares from the award is valid because (a) it was intended to exclude the Munsees, and (b) there were valid reasons for excluding the Munsees. The Munsees were the object of special legislative concern because the processing of their claims under a 1968 distribution statute had created administrative burdens and delay. They were properly excluded because their ancestors were not members of the tribe when the wrong occurred. Neither of these reasons has any relevance to the Kansas Delawares. They are admittedly lineal descendants of victims of the wrong and they had shared in the 1968 award in such an orderly manner that Congress was not even aware of their separate status. It is thus ironic—perhaps even perverse—to justify the special treatment of the Kansas Delawares by including them in a class whose other members were properly excluded from the award for reasons which have no application whatsoever to the Kansas Delawares. Because the Kansas Delawares were so administratively inoffensive that they literally became invisible they will fail to share in the distribution as a result of a decision to *avoid* administrative difficulty.

The statutory exclusion of the Kansas Delawares from any share in the fund appropriated to pay a judgment in favor of a class to which they belong is manifestly unjust and arbitrary. Neither the actual explanation, nor any of the hypothetical explanations, is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." But having said all this, I must confront the ultimate question whether the statute is therefore unconstitutional.

---

to membership in the tribe in 1818, participated in that award. That award, like this one, but unlike the 1904 appropriation, was in satisfaction of an Indian Claims Commission judgment. Thus the more recent and more relevant congressional precedent supports inclusion of the Kansas Delawares, not exclusion.

Improbable as the possibility seems, I am not prepared to say that if Congress had actually reviewed the status of the Kansas Delawares, it might not have found some principled basis for treating them differently from other Delawares. And it is clear that the discrimination, far from evidencing actual discriminatory *intent,* is the consequence of a legislative *accident,* perhaps caused by nothing more than the unfortunate fact that Congress is too busy to do all of its work as carefully as it should. I must also acknowledge that Congress followed accepted legislative procedures in enacting the statute. Finally, I am most reluctant to suggest that the constitutionality of legislation should turn on the actual motivation, or the lack thereof, of the legislators who participated in the legislative process. Perhaps, therefore, the Court is following a wise course in declining to intervene in an area where the greatest deference is due Congress.

Nevertheless, four considerations persuade me that this legislative classification is invalid. First, the members of the class whose rights were adjudicated by the Indian Claims Commission have more than an ordinary interest in equal treatment.[8] Second, there is no need for any discrimination at all within this class of litigants; this, therefore, is not a case in which the need to draw *some* line may justify the otherwise arbitrary character of the particular line which has been drawn.[9] Third, no principled justification for the particular

---

[8] The fact that the legislative action under review is the culmination of a quasi-judicial proceeding brought on behalf of the entire class distinguishes this legislation from policy decisions of general applicability. Cf. *Eastlake* v. *Forest City Enterprises, Inc.,* 426 U. S. 668, 680 (1976) (STEVENS, J., dissenting). Moreover, " 'Congress' unique obligation toward the Indians,' " *ante,* at 85, surely includes a special responsibility to deal fairly with similarly situated Indians.

[9] Cf. *Mathews* v. *Diaz,* 426 U. S. 67, 82–84; *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 41 (Holmes, J., dissenting).

discrimination against the Kansas Delawares has been identified. And fourth, there is no reason to believe that the discrimination is the product of an actual legislative choice.[10] Under these circumstances I conclude that there has been a deprivation of property without the "due process of lawmaking" that the Fifth Amendment guarantees.[11]

---

[10] See *Mathews* v. *Lucas,* 427 U. S. 495, 516; *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648 n. 16; *Flemming* v. *Nestor,* 363 U. S. 603, 611; cf. *McDonald* v. *Board of Election Comm'rs,* 394 U. S. 802, 809; *Baker* v. *Carr,* 369 U. S. 186, 226; *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415–416.

[11] Although I am indebted to Professor Linde for the phrase, I cannot fairly claim that my conclusion is compelled by the analysis in his illuminating article, Due Process of Lawmaking, 55 Neb. L. Rev. 197 (1976).