# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

CHEROKEE NATION OF
OKLAHOMA, on behalf of all its
members,

     Plaintiff-Appellant,

v.

GALE NORTON, Secretary of the United
States Department of the Interior;
AURENE MARTIN, Acting Assistant
Secretary of the United States Department
of the Interior; and DELAWARE TRIBE
OF INDIANS,

     Defendants-Appellees.

No.  03-5055

## ORDER

Filed February 16, 2005

Before **SEYMOUR**, **BALDOCK** and **HARTZ**, Circuit Judges.

The matter is before the Court on the Federal Appellees' petition for panel rehearing.  The Cherokee Nation has filed a response.  Upon consideration of these pleadings, we grant the petition for the limited purpose of striking the sentence on page 25 of the original decision which states, "[a]ny action taken on the agency's 1996 final decision is void[]" and replacing it with the following sentence designated here in bold:

**"Any action taken by the agency on its 1996 final decision is void."** The petition for rehearing is otherwise denied. An amended version of the court's opinion is attached to this order and shall stand as a substitute to the decision issued originally on November 16, 2004.

Entered for the Court
PATRICK FISHER, Clerk of Court


by:
Deputy Clerk

2

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CHEROKEE NATION OF
OKLAHOMA, on behalf of all its
members,

    Plaintiff-Appellant,

v.

GALE NORTON, Secretary of the United
States Department of the Interior;
AURENE MARTIN, Acting Assistant
Secretary of the United States Department
of the Interior; and DELAWARE TRIBE
OF INDIANS,

    Defendants-Appellees.

No. 03-5055

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 98-CV-903-H)**
**241 F. Supp. 2d 1368**

Lloyd B. Miller of Sonosky, Chambers, Sachse, Miller & Munson, LLP, Anchorage,
Alaska (Arthur Lazarus, Jr. and Melanie B. Osborne of Sonosky, Chambers, Sachse,
Miller & Munson, LLP, Anchorage, Alaska; Julian K. Fite and John E. Parris of the
Cherokee Nation Department of Justice, Tahlequah, Oklahoma, with him on the briefs)
for Appellant Cherokee Nation of Oklahoma.

David C. Shilton of the United States Department of Justice, Washington D.C. (Katherine
J. Barton, Attorney, United States Department of Justice, Washington, D.C., Kelly A.
Johnson, Acting Assistant Attorney General, Washington D.C., Thomas L. Sansonetti,
Assistant Attorney General, Washington D.C., David E. O'Meilia, United States
Attorney, Tulsa, Oklahoma, Loretta Radford, Assistant United States Attorney, Tulsa,

Oklahoma of the United States Department of Justice; Barbra N. Coen, of counsel, Office of the Solicitor, United States Department of the Interior, Washington D.C., with him on the briefs) for Federal Appellees.

Gina Carrigan-St.Clair of the Carrigan Law Offices, Tulsa, Oklahoma (Philip Baker-Shenk, Washington D.C., Wilda Wahpepah, Washington D.C., and Skip Durocher of Dorsey & Whitney LLP, Minneapolis, Minnesota, with her on the briefs) for Appellee Delaware Tribe of Indians.

---

Before **SEYMOUR**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

The Cherokee Nation of Oklahoma ("Cherokee Nation") and Delaware Tribe of Indians ("Delawares") entered into a contract pursuant to a treaty negotiated between the Cherokee Nation and the United States Government. The Supreme Court has twice interpreted that contract. We must decide in this case whether the Department of Interior's ("DOI") interpretation of that contract and concomitant decision to extend Federal recognition to the Delawares is contrary to the Supreme Court's reading of the same document.

I.

The law governing Federal recognition of an Indian tribe is, today, clear. The Federally Recognized Indian Tribe List Act of 1994 provides Indian tribes may be recognized by: (1) an "Act of Congress;" (2) "the administrative procedures set forth in part 83 of the Code of Federal Regulations[;]" or (3) "a decision of a United States

2

court." Pub. L. No. 103-454, § 103(3), 108 Stat. 4791; see also United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547-48 (10th Cir. 2001). A recognized tribe is placed on the DOI's "list of recognized tribes[.]" 25 U.S.C. §§ 479a(3), 479a-1; 25 C.F.R. § 83.5(a).

The Delawares had never been on the list prior to this lawsuit. The Delawares began a quest for Federal recognition in 1992. They submitted a letter to the DOI expressing an intent to petition for Federal acknowledgment under the "Part 83 procedures." See 25 C.F.R. §§ 83.1, 83.4. The DOI informed the Delawares it would not consider their petition. The agency explained the "Delawares have not existed as an independent political identity since 1867, and have been absorbed into the Cherokee Nation of Oklahoma for general governmental purposes since that time." The Delawares, in response, requested instructions for filing an appeal. The DOI thereafter reaffirmed its position, but "clarified" its previous non-appealable advisory letter did not prevent the Delawares from petitioning under the Part 83 procedures.

The Delawares never formally petitioned for acknowledgment. Instead, they requested the DOI to "reconsider and retract" the agency's position, as expressed in a 1979 letter, that it would only engage in government-to-government relations with the Delawares through the Cherokee Nation. The agency conducted a "legal review" of the situation at the Delawares' behest. The DOI concluded the 1979 position should be retracted and published a "notice of intent" to do the same. See 61 Fed. Reg. 33,534-35

3

(June 27, 1996). The DOI elected not to follow the Part 83 procedures because they do not apply to "already acknowledged" tribes; and under the agency's new position, the Delawares had been acknowledged since 1867. See 25 C.F.R. § 83.3(b). The agency issued its final decision, after notice and comment, in September 1996. See 61 Fed. Reg. 50,862-63 (Sept. 27, 1996). The final decision declared "the Delaware Tribe of Indians is a tribal entity recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of its status as an Indian Tribe." Id. at 50,863.

On October 2, 1996, the Cherokee Nation sued the DOI. Cherokee Nation of Okla. v. Babbitt, 944 F. Supp. 974 (D.D.C. 1996). The Nation alleged the agency violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, when it extended recognition to the Delawares. The district court, upon the DOI's motion, dismissed the suit because the Delawares were an indispensable party that could not be joined because of sovereign immunity. Cherokee Nation, 944 F. Supp. at 986. The D.C. Circuit reversed, holding the Delawares could not assert sovereign immunity because they relinquished their tribal sovereignty when they entered into an agreement with the Cherokee Nation in 1867. Cherokee Nation of Okla. v. Babbitt, 117 F.3d 1489, 1503 (D.C. Cir. 1997). The D.C. Circuit, however, limited its holding to the joinder issue and remanded the case for the district court to decide the "proper interpretation of the 1867 agreement with the Delaware Tribe[] as a party to the proceedings and in light of the full

4

administrative record[.]"[1]  Id. at 1503 n.15.  On remand, the district court transferred the

case to the Northern District of Oklahoma because it lacked personal jurisdiction over the

Delawares.

There, the district court extended "great deference" to the DOI and concluded its

retraction of the 1979 letter did not violate the APA.  Cherokee Nation of Okla. v.

Norton, 241 F. Supp. 2d 1368, 1373-74 (N.D. Okla. 2002).  The court reasoned the

Delawares were a federally recognized tribe prior to 1979 because (1) a claims statute

appropriated funds to the "Delaware Tribe of Indians," and (2) "the Supreme Court

explicitly and unambiguously declared that the Delaware Tribe of Indians was a federally

recognized Indian tribe in Delaware Tribal Business Committee v. Weeks, 430 U.S. 73

(1977)."  Id. at 1372-73.  The court therefore did not consider the initial 1867 agreement

entered into between the Cherokee Nation and Delawares.  Id. at 1372.

The Cherokee Nation appeals.  We have jurisdiction, 28 U.S.C. § 1291, and

"afford no particular deference to the district court's review of [the] agency['s] action;

our review of the administrative record pertaining to the challenged action is

independent."  Pennaco Energy Inc. v. United States Dep't of the Interior, 377 F.3d 1147,

1156 (10th Cir. 2004) (internal quotations and citation omitted).  Because the DOI's final

decision is contrary to Supreme Court precedent and the Federally Recognized Indian

Tribe List Act, we reverse.

---

[1] The D.C. Circuit's opinion is not the law of the case because the court did not reach the
merits of the Cherokee Nation's claim.  See United States v. Hatter, 532 U.S. 557, 566 (2001).

## II.

The APA requires an agency to articulate a satisfactory explanation for its action. Kansas v. United States, 249 F.3d 1213, 1228-29 (10th Cir. 2001). Agency action *must* be upheld, if at all, on the basis the agency articulated. Federal Power Comm'n v. Texaco Inc., 417 U.S. 380, 397 (1974); Pennaco Energy Inc., 377 F.3d at 1157. An agency's action, on the other hand, may be set aside under the APA if it is arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A). "And the Act has been interpreted . . . to require agencies, on pain of being found to have acted arbitrarily and capriciously, to comply with their own regulations[.]" Miami Nation of Indians of Ind., Inc. v. United States Dep't of the Interior, 255 F.3d 342, 348 (7th Cir. 2001); Utahns for Better Transp. v. United States Dep't of Transp., 305 F.3d 1152, 1165 (10th Cir. 2002). Furthermore, although the APA's arbitrary and capricious standard is ordinarily a deferential one, see id. at 1164, such deference is not unfettered nor always due. See General Dynamics Land Sys. Inc. v. Cline, 540 U.S. 581, –, 124 S. Ct. 1236, 1248 (2004) (explaining no deference is owed to a clearly wrong agency interpretation); Adams Fruit Co., Inc. v. Barrett, 494 U.S. 638, 649-50 (1990) *superceded by* 29 U.S.C. § 1854 (explaining a precondition to agency deference is a congressional delegation of administrative authority); Watt v. Alaska, 451 U.S. 259, 273 (1981) (explaining an agency interpretation that conflicts with an earlier interpretation is entitled to considerably less deference than a consistently held position).

In this case, the DOI based its final decision on a "legal analysis of the pertinent treaties and agreements as well as a review of [its] administrative practice." 61 Fed. Reg. at 50,863. More specifically, the agency's recognition of the Delawares was based solely on its *analysis of the treaties and agreements* entered into by the Cherokee Nation and Delawares in the 1860s. The DOI's "review" of its administrative practice over the next century was simply to confirm the Delawares' status. The DOI does *not* maintain its administrative practice from 1867 to 1979 "reconstituted" or "restored" the Delawares as a tribe.[2] The resolution of this case thus turns on the status of the Delawares under the treaties and the agreements entered into by the Cherokees and Delawares in the 1860s. We do not afford any deference to the DOI's position on this issue because Congress did not give it the discretion to administer those treaties and agreements. Adams Fruit Co., 494 U.S. at 649; Citizen Band of Potawatomi Indian Tribe of Okla. v. Collier, 142 F.3d 1325, 1332 (10th Cir. 1998); see also Cherokee Nation, 117 F.3d at 1499. We now turn to those treaties and agreements.

---

[2] The Delawares have advanced an alternative "restoration" argument. They assert the "modern-era record alone is more than sufficient to sustain the [DOI's] 1996 decision, even if this Court were to disagree with the [DOI's] interpretation of the historical documents in this case." The district court ostensibly relied on a restoration theory to sustain the DOI's decision. See Cherokee Nation, 241 F. Supp. 2d at 1372-74. The district court erred because the DOI did not articulate "restoration" as a basis for its final decision. See Texaco, 417 U.S. at 397; Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983). Further, the DOI conceded at oral argument its position rested solely on a theory that the Delawares preserved their tribal identity when they relocated to the Cherokee Nation. We therefore decline to consider the Delawares' "restoration" argument because the issue is not properly before the court. We leave for another day what effect, if any, the post-1867 legislative and executive dealings with the Delawares had on their alleged status as a tribe. See infra at 23.

III.

The history of the Delawares' tortured migration westward has been told elsewhere, see Weeks, 430 U.S. at 75-79 & n.2, and we need not repeat it. Suffice it to say, the "main body" of Delawares resided on a reservation in Kansas in the 1850s. Id. at 77. Notwithstanding promises to the contrary, see id., the United States sought to move the Delawares again in 1866. To that end, the United States entered into a treaty with the Delawares. Treaty with the Delawares, July 4, 1866, U.S.-Del. Indians, 14 Stat. 793 ("1866 Delaware Treaty"). The 1866 Delaware Treaty provided, among other things, the Delawares could purchase from the United States "a tract of land ceded to the Government by the Choctaws and Chickasaws, the Creeks, or the Seminoles, or which may be ceded by the Cherokees in the Indian country [now Oklahoma], to be selected by the Delawares in one body in as compact form as practicable[.]"

The United States subsequently entered into a treaty with the Cherokee Nation. Treaty with the Cherokee, July 19, 1866, U.S.-Cherokee Nation, 14 Stat. 799 ("1866 Cherokee Treaty"). Article 15 of the 1866 Cherokee Treaty provided an "incorporation option" and "preservation option" for friendly Indians settling upon Cherokee lands:

> The United States may settle any civilized Indians, friendly with the Cherokees and adjacent tribes, within the Cherokee country, on unoccupied lands east of 96°, on such terms as may be agreed upon by any such tribe and the Cherokees, subject to the approval of the President of the United States, which shall be consistent with the following provisions, viz:
>
> [Incorporation Option] Should any such tribe or band of Indians settling in said country abandon their tribal organization, there being first paid into the

8

Cherokee national fund a sum of money which shall sustain the same proportion to the then existing national fund that the number of Indians sustain to the whole number of Cherokees then residing in the Cherokee country, they shall be *incorporated into* and ever after remain a part of the Cherokee Nation, on equal terms in every respect with native citizens.

[Preservation Option] And should any such tribe, thus settling in said country, decide to preserve their tribal organizations, and to maintain their tribal laws, customs, and usages, not inconsistent with the constitution and laws of the Cherokee Nation, they shall have a *district of country set off for their use by metes and bounds* equal to one hundred and sixty acres, if they should so decide, for each man, woman, and child of said tribe, and
> [1] shall pay for the same into the national fund such price as may be agreed on by them and the Cherokee Nation, subject to the approval of the President of the United States . . . .
> [2] And the said tribe thus settled shall also pay into the national fund a sum of money, to be agreed on by the respective parties, not greater in proportion to the whole existing national fund and the probable proceeds of the lands herein ceded or authorized to be ceded or sold than their numbers bear to the whole number of Cherokees then residing in said country, and thence afterwards they shall enjoy all the rights of native Cherokees.

(emphasis added).

On April 8, 1867, the Cherokee Nation entered into "Articles of Agreement" with the Delawares ("1867 Agreement") pursuant to Article 15 of the 1866 Cherokee Treaty. The preamble to the 1867 Agreement provides the Cherokee Nation and Delawares held a "full and free conference . . . looking to a location of the Delawares upon the Cherokee lands, *and* their *consolidation* with said Cherokee Nation[.]" (emphasis added). The agreement provided for both conditions.

The Cherokee Nation first "agree[d] to sell to the Delawares, for their *occupancy*, a quantity of land east of the line of the 96° west longitude, in the aggregate equal to 160 acres of land for each [registered] individual of the Delaware Tribe . . . [with] the selections of the lands to be purchased . . . made by said Delawares in *any part* of the Cherokee reservation east of said line of 96°[.]" [3] (emphasis added). The Delawares paid $157,600 (one dollar per acre) for such occupancy rights and a preferred allotment position. The "Delawares further agree[d], that there shall be paid . . . a sum of money, which shall sustain the same proportion to the existing Cherokee National fund, that the number of Delawares registered as above mentioned, and removing to the Indian country, sustains to the whole number of Cherokees residing in the Cherokee Nation." The Delawares paid $121,824.28 into the Cherokee national fund based on the formula recited in the agreement. The 1867 Agreement concluded:

> On fulfillment by the Delawares of the foregoing stipulations, all the
> members of the tribe, registered as above provided, *shall* become members
> of the Cherokee Nation, with the same rights and immunities, and the same

---

[3] The Delawares sent a delegation to the Cherokee Nation in October 1866 for "the purpose of selecting a new home for their people[.]" The delegation did not locate any suitable land west of the 96° meridian, but did find a satisfactory ten-by-thirty mile tract east of the 96° meridian. John Connor, principal chief of the Delawares, thereafter sent a letter to William P. Ross, principal chief of the Cherokee Nation, explaining the delegation had found a suitable tract of land the Delawares could settle upon to preserve their tribal organization under the 1866 Cherokee Treaty. The letter requested the matter be presented to the Cherokee National Council for final action. No evidence exists showing the matter was ever proposed to the council. Instead, the Delawares sent a delegation, of which John Connor was a part, to Washington D.C. to perfect the arrangement for relocating the Delawares to the Cherokee Nation. There, the Delaware delegation entered into the 1867 Agreement, which the President approved as the agreement and 1866 Cherokee Treaty required.

10

participation (and no other,) in the national funds, as *native* Cherokees, save as hereinbefore provided. And the children hereafter born of *such Delawares so incorporated* into the Cherokee Nation, shall in all respects be regarded as *native Cherokees*.

(emphasis added).

The 1867 Agreement was "subject to the approval of the President of the United States[.]" The Secretary of the DOI, then Orville H. Browning, transmitted the agreement to the President. Secretary Browning's transmittal letter explained the agreement "provid[ed] for *uniting the two tribes*, as contemplated by the Cherokee Treaty of July 19th 1866" and "recommend[ed] that it be approved." (emphasis added). President Andrew Johnson approved the agreement. The registered Delawares fulfilled all of the stipulations in the 1867 Agreement and moved onto selected 160-acre tracts scattered throughout the Nation.

IV.

The genesis of the present case is the DOI's 1996 decision to extend Federal recognition to the Delawares based on its legal analysis of the 1866 Cherokee Treaty and 1867 Agreement. The agency concluded the agreement evidenced the Delawares' election of the treaty's "preservation option" because it required two payments (whereas the incorporation option only required one) and Delawares made two payments ($157,600 and $121,824) to the Cherokee Nation. The DOI therefore maintains the Delawares preserved their tribal identity when they moved to the Cherokee Nation in the 1860s.

11

We do not begin with a clean slate.  In fact, *every court* to consider the actual terms of the 1866 Cherokee Treaty and 1867 Agreement has explicitly or implicitly rejected the DOI's reading of the agreement.  See Journeycake v. Cherokee Nation, 28 Ct. Cl. 281, 311 (1893) *aff'd as modified* 155 U.S. 196 (1894) (holding that under the 1867 Agreement "two independent bodies politic united and became one, the lesser, according to its terms, being merged into the greater."); Cherokee Nation v. Journeycake, 155 U.S. 196, 210-11 (1894) (holding that under the 1867 Agreement the "Delawares became incorporated into the Cherokee Nation, and are members and citizens thereof[.]"); Delaware Indians v. Cherokee Nation, 38 Ct. Cl. 234, 256 (1903) *aff'd* 193 U.S. 127 (1904) (holding that "[b]y the introduction and admission of the Delawares as part of the Cherokee Nation they became a part of the people of such nation and bound in common with the Cherokees by the political power of the nation[.]"); Delaware Indians v. Cherokee Nation, 193 U.S. 127, 135 (1904) (reaffirming the purpose of the 1867 Agreement was "to incorporate the registered Delawares into the Cherokee Nation, with full participation in the political and property rights of citizens of that nation."); Cherokee Nation, 944 F. Supp. at 982 *rev'd on other grounds* 117 F.3d 1489 (D.C. Cir. 1997) (holding the "Delaware[s] settled in Cherokee Nation territory pursuant to the first provision of Article 15, under which the settling Delaware became full and equal Cherokee Nation citizens."); Cherokee Nation, 117 F.3d at 1503 (holding that "by

12

entering into the 1867 Agreement the Delaware Tribe of Indians relinquished its tribal identity or sovereignty in relation to the Cherokee Nation."). We now join them.

A.

In Journeycake, 155 U.S. at 196, the Supreme Court considered a dispute between the Delawares and Cherokee Nation over the proper distribution of national funds. The Cherokee National Council had directed certain rent proceeds be distributed to "native Cherokees," to the exclusion of Delawares. The Delawares filed suit in the court of claims, alleging the Cherokee Nation's discriminatory distribution of the rental proceeds violated the 1867 Agreement.[4] The case therefore "hinge[d] on the status of the individual Delawares as members and citizens of the Cherokee Nation, and the rights secured to them by the agreement of April 8, 1867." Id. at 204.

The Court, after reviewing the 1866 Cherokee Treaty and 1867 Agreement, easily concluded that because "the registered Delawares have become incorporated into the

---

[4] As a result of disputes arising between the Delawares and Cherokee Nation over the proper distribution of monies from the Cherokee national fund, see Act of October 19, 1888, Chap. 1211, 25 Stat. 608, Congress enacted a statute providing the court of claims with jurisdiction "to determine . . . the just rights in law or in equity of the . . . Delaware Indians, who are settled and incorporated into the Cherokee Nation[.]" Act of October 1, 1890, Chap. 1249, § 1, 26 Stat. 636. The Act provided the Delawares with a private cause of action, "either separately or jointly," against the Cherokee Nation and "[t]hat the said suit or suits may be brought in the name of the principal chief or chiefs of the said . . . Delaware Indians[.]" Id. §§ 2-3. Charles Journeycake, principal chief of the Delawares, filed suit under the Act on behalf of the Delawares. See Journeycake, 28 Ct. Cl. at 319 (decreeing the rights "of the Delaware Indians who are settled and incorporated into the Cherokee Nation"); see also C.A. Weslager, The Delaware Indians: A History 447 (1972) (explaining Journeycake was "authorized and empowered" to represent the Delawares in court).

Cherokee Nation, and are members and citizens thereof, it follows necessarily that they are, equally with the native Cherokees, the owners of, and entitled to share in the profits and proceeds of, [the leased] lands." Id. at 210-11. The Court rejected the Cherokee Nation's arguments to the contrary based on the "plain import of the language used in the [1867] agreement[.]" Id. at 216. The agreement's language compelled the Court to "conclude that by such agreement the Delawares became incorporated into the Cherokee Nation, became members thereof, and, as such, entitled equally with the native Cherokees to all their rights in the reservation and [leased lands]." Id.

In so holding, the Court considered evidence of the Delawares' two payments to the Cherokee Nation, id. at 203, and specifically analyzed the Delawares' purchase of land occupancy rights. Id. at 212-15. The Court nevertheless found the 1867 Agreement expressed the parties' intent to incorporate the Delawares for two reasons. First, the parties did not provide for the "setting apart of a distinct body of land in any portion of the reservation for the Delaware tribe[.]" Id. at 205. The Court explained the Delawares' failure to purchase a "distinct body of lands" was inconsistent with the settlement of "*tribes as tribes* within the limits of the Cherokee Nation." Id. at 213 (emphasis added). Second, the Delawares did not purchase their lands in fee simple, see id. at 212, 214-15, but instead acquired occupancy rights in kind with all Cherokees and a preferential allotment position. Id. at 213. "All this was in the line of the expressed thought of a

14

consolidation of the[] Delawares with, and absorption of them into, the Cherokee Nation as individual members thereof." Id.

Subsequently, in Delaware Indians, 193 U.S. at 127, "the Delaware Indians residing in the Cherokee Nation, *as a tribe and individually*, . . . su[ed] . . . for the purpose of determining the right of the Delaware Indians in and to the lands and funds of [the Cherokee] nation under the contract and agreement . . . dated April 8, 1867." Id. at 129 (emphasis added) (internal quotation and citations omitted); see also Act of June 28, 1898, Chap. 517, § 25, 30 Stat. 495, at 504. The Court first rejected the Delawares' claim that the 1867 Agreement secured to them, as a tribe, their selected lands east of the 96° meridian. Delaware Indians, 193 U.S. at 134-35. The Delawares' argument failed because it was contrary to the Court's *holding* in Journeycake and inconsistent with their purchase of occupancy rights, which were "conferred *not* upon the Delaware Nation, but upon certain registered Delawares who [were] incorporated into the Cherokee Nation." Id. at 135 (emphasis added).

The Court also rejected the Delawares' argument that they individually owned their selected tracts in fee simple. The Court explained the adult Delawares had only purchased occupancy rights in the Cherokee lands under the 1867 Agreement. Furthermore, the agreement provided "'the children hereafter born of such Delawares so incorporated into the Cherokee Nation shall, in all respects, be regarded as native Cherokees.'" Id. at 138. The Court found

15

> [t]his provision is *utterly inconsistent* with the grant of an estate in the lands to survive the 'occupancy' of the registered Delawares. Such children are to have the rights of native Cherokees, and no more. Their parents were incorporated into the Cherokee Nation with certain specific rights; the children were to stand upon an equality with their adopted brethren of the Cherokee blood.

Id. (emphasis added). The Court accordingly held the Delawares only obtained life estates in their lands selected under the 1867 Agreement. Id. at 143.

The Delawares nevertheless insisted the 1867 Agreement "should not be literally enforced in view of the understanding of the parties[]" and sought to introduce parol evidence. Id. at 140. The Court, however, found the contract unambiguous and rejected the Delawares' resort to parol evidence. Id. at 140-42. The Court explained "no room" existed in the case to "depart[] from the familiar rules of law protecting written agreements from the uncertainties of parol testimony." Id. at 141. "In light of the circumstances and the language used in the writing, its construction [was] not rendered difficult because of latent ambiguities." Id. The Delawares were therefore entitled to their occupancy and preferential allotment rights, but "[i]n all other respects *the Cherokee citizens, whether of Delaware or Cherokee blood*, should be given equal rights in the lands and funds of the Cherokee Nation." Id. at 146 (emphasis added).[5]

---

[5] The D.C. Circuit concluded in this case the Delawares were not entitled to assert sovereign immunity. Cherokee Nation, 117 F.3d at 1503. Relying on Journeycake and Delaware Indians, the D.C. Circuit held the Delawares relinquished their tribal sovereignty in relation to the Cherokee Nation because the two tribes consolidated into a single unit under the 1867 Agreement. Id. at 1501-03. The court explained the Delawares' two payments to the Cherokee Nation was consistent with their election to settle under the 1866 Cherokee Treaty's

(continued...)

16

B.

Based on the foregoing, the DOI's conclusion the Delawares preserved their tribal identity under the 1866 Cherokee Treaty and 1867 Agreement is *clearly* contrary to Supreme Court precedent. The "rights adjudicated" in Journeycake and Delaware Indians "turned upon the construction of the agreement of April 8, 1867, and its nature and the history of the events which led up to its execution[.]" Delaware Indians, 193 U.S. at 134. The Court held the unambiguous language of the 1867 Agreement provided for the Delawares' incorporation into the Cherokee Nation with their children taking only the same rights as other citizens. Id. at 143; Journeycake, 155 U.S. at 216. We are "bound by the Supreme Court's interpretation of that Agreement in Journeycake and Delaware Indians." Cherokee Nation, 117 F.3d at 1500; see also State Oil Co. v. Kahn, 522 U.S. 3, 20 (1997). "An agency also *must* conform its conduct to a decision of the Supreme Court in all future cases, even if the agency believes that the Court was wrong." 1 Richard J. Pierce, Jr., Administrative Law Treatise § 2.9, at 129 (2002) (emphasis added).

Our task is therefore simple. Although we seek to avoid engaging in a repetitive analysis of the 1866 Cherokee Treaty and 1867 Agreement – an analysis the Supreme Court has twice engaged in – we again explain why the Delawares did not preserve their tribal identity under those documents. The 1866 Cherokee Treaty provided for the

---

[5](...continued)
incorporation option. Furthermore, the parties' "use of the term 'incorporated' in the 1867 Agreement [was] sufficiently unambiguous to constitute an express relinquishment of the Delawares' status as a separate sovereign." Id. at 1501.

settlement of Indians within the Cherokee Nation. The terms the tribes agreed upon for such settlement, however, had to be "consistent" with one of the options provided in Article 15 of the 1866 Cherokee Treaty. The unambiguous language of the 1867 Agreement, including the provisions for the Delawares' two payments, is consistent with the Delawares selection of the incorporation option of Article 15. Specifically, the Delawares made a proportional payment of $121,824 into the national fund and provided they were consolidating with and incorporating into the Cherokee Nation. That the Delawares made an additional payment of $157,600 for land occupancy and preferential allotment rights is not inconsistent with the incorporation option. In contrast, and for the reasons detailed below, the language of the agreement and the nature of its execution are inconsistent with Article 15's preservation option.

To begin, the 1867 Agreement describes the Delawares consolidation with or incorporation into the Cherokee Nation three times. We agree with the Supreme Court (as we must) and the D.C. Circuit that the agreement's language is unambiguous. Delaware Indians, 193 U.S. at 141; Cherokee Nation, 117 F.3d at 1501. "Consolidation" and "incorporation" carried the same meanings in 1867 as they do today: to unite. Compare Webster's Dictionary of the English Language 279 (consolidate), 677 (incorporate) (1864) with Webster's Third New International Dictionary 484 (consolidate), 1145 (incorporate) (1981). The DOI nevertheless concluded "the Agreement uses the language 'consolidation' in the context of the physical location of the

18

Delaware from Kansas to Cherokee country, not in the context of governmental purposes." The agency's reading is, however, inconsistent with the plain language of the 1867 Agreement, which provides the parties were "looking to a location of the Delawares upon the Cherokee lands, *and* their consolidation with said Cherokee Nation[.]" (emphasis added). With respect to "incorporation," the DOI suggests the language can be read consistent with Article 15's preservation option. Perhaps. The problem is the Supreme Court specifically rejected the DOI's reading in Delaware Indians. There, the Court explained the "Delawares *were made part of the Cherokee Nation*" and became "a *component part*" of the nation "on equal terms with other citizens." Delaware Indians, 193 U.S. at 144 (emphasis added). Furthermore, the agreement provides Delaware children shall be regarded as *native Cherokees*. Such a provision is wholly inconsistent with the "preservation" of tribal identity. See Cherokee Nation, 117 F.3d at 1502.

Next, as the Supreme Court explained, the 1867 Agreement is important for what it does not contain. Article 15's preservation option contains the mandatory condition that tribes settling under it "*shall* have a district of country set off for their use by metes and bounds[.]" (emphasis added). In Journeycake, 155 U.S. at 205, 213, the Court twice mentioned the agreement's crucial omission of a "provision for the setting apart of a distinct body of lands" to support its *holding* the Delawares "became incorporated into the Cherokee Nation[.]" Id. at 216.

19

In this appeal, the Delawares (and to a lesser extent the DOI) advance the novel theory they actually selected and settled upon a ten-by-thirty mile tract of land in the Cherokee Nation. Absolutely nothing in the administrative record supports the Delawares' theory. See supra n.3. Instead, the 1867 Agreement "contemplate[d] personal selection of separate tracts by individual Delawares." Journeycake, 155 U.S. at 205. The agreement's language could not be more clear: "the selections of the lands to be purchased by the Delawares, may be made by said Delawares in *any part* of the Cherokee reservation east of said line of 96°[.]" (emphasis added). The evidence in the administrative record demonstrates the Delawares did, in fact, select individual tracts of lands for their homes throughout the reservation. That some, or even "most," Delawares selected their tracts in the Cooweescoowee district of the reservation is immaterial.

Most importantly, the DOI's theory that the Delawares' two payments to the Cherokee Nation evidences "preservation" rather than "incorporation" is misguided. In Journeycake, 155 U.S. at 203, the Court was aware of the payments and did not express any disagreement with the finding that the Delawares' proportional payment into the national fund was not "susceptible of misconstruction and concerning it no controversy has arisen." Journeycake, 28 Ct. Cl. at 307. The Court then based its decision on the land purchase payment. In fact, the Court considered the Delawares' purchase of land occupancy rights indicative of their intent to incorporate. Journeycake, 155 U.S. at 212-13. Further, the Court reaffirmed Journeycake's holding and reasoning in Delaware

20

Indians, 193 U.S. at 143, when it concluded the Delawares only purchased life estates in the Cherokee lands. The Delawares' purchase of life estates in scattered tracts throughout the Cherokee Nation is inconsistent with the actions of a people seeking to "preserve" their tribal identity.

The DOI and Delawares also argue the 1867 Agreement is ambiguous and urge us to consider parol evidence. We decline for three reasons. First, the admission of parol evidence is improper because the 1867 Agreement is unambiguous. See Richardson v. Hardwick, 106 U.S. 252, 254 (1882); Eastern Band of Cherokee Indians v. United States, 117 U.S. 288, 311 (1886). Second, we cannot tell the Supreme Court that it incorrectly concluded the agreement did not suffer from any ambiguities requiring the consideration of parol evidence. Delaware Indians, 193 U.S. at 141; Hutto v. Davis, 454 U.S. 370, 375 (1982) (per curiam) (explaining that "unless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). Third, and *assuming* for the moment the agreement is ambiguous (which it is not) and the Supreme Court had not held it unambiguous (which it did), the Delawares would still not be in any better position. The parties' contemporaneous actions evidenced their belief the Delawares incorporated into the Cherokee Nation.[6] See Journeycake, 155 U.S. at 216-17

_____

[6] For example, then-Secretary Browning described the 1867 Agreement as providing for the uniting of two tribes. See also Delaware Indians in Cherokee Nation – Allotment, 25 Pub. Lands Dec. 297, 301-302 (Dep't of Interior 1897). The Delaware delegation that entered into the
(continued...)

21

We finally note the DOI's and Delawares' reliance on <u>Weeks</u> is misplaced.  In

<u>Weeks</u>, 430 U.S. at 75, the Supreme Court considered whether a claims statute excluding

the "Kansas Delawares" – the Delaware Indians who remained in Kansas under the 1866

Delaware Treaty – from the statutory distribution of a claims award violated the Equal

Protection Clause.  The Court commented that "[d]espite their association with the

Cherokees, these Indians, called 'Cherokee Delawares' in this suit, have over the years

maintained a distinct group identity, and they are today a federally recognized tribe."  <u>Id.</u>

at 77 & n.8.  The Court's dicta, <u>see</u> <u>Cherokee Nation</u>, 117 F.3d at 1502, indicated

Congress' distribution of a claims award to the "Delaware Tribe of Indians," <u>see</u> Act of

April 21, 1904, Chap. 1402, § 21, 33 Stat. 189, at 222, was sufficient to recognize the

Delawares as a tribe for the limited purpose of the claims statute at issue in that case.

<u>Weeks</u>, 430 U.S. at 77 n.8; <u>see</u> <u>also</u> <u>id.</u> at 94 (Stevens, J., dissenting).  As Cohen's

handbook on Federal Indian law explains:

> The question whether a group is a tribe for purposes of statutes allowing
> claims to be asserted against the United States has arisen many times.
> Where several Indian groups are generally considered a single tribe for

---

[6](...continued)
1867 Agreement represented to the Commissioner of Indian Affairs that the Delawares had "merged" themselves into the Cherokee Nation.  The Delaware Council, then in Kansas, recognized their delegation had entered into an agreement providing for the "incorporation or merging" of the tribe into the Cherokee Nation and protested the same.  Despite the original dissension, the Delawares ultimately moved to the Cherokee Nation and began, as described in <u>Journeycake</u>, receiving per capita distributions from the Cherokee national fund as citizens. "[T]he first manifestation of a claim of difference between the native Cherokees and the registered Delawares as to the extent of their interests in the lands or the proceeds thereof" did not occur until 1883.  <u>Journeycake</u>, 155 U.S. at 216-17.

> political and administrative purposes, Congress may nevertheless assign
> tribal status to portions of the tribe for claims purposes. For example, Tribe
> A and Tribe B have combined to form Tribe C and share a common
> reservation and common funds. However, at some time prior to their
> merger, Tribe A had suffered an injury for which Congress later offers
> redress in the form of a jurisdictional act. In such a case Congress may
> recognize Tribe A as a tribe, entitled to bring suit in the Court of Claims,
> even though for most other purposes it is only a part of Tribe C.

See Felix S. Cohen, Handbook of Federal Indian Law Chap. 1, § B2d, at 12 (1982 ed.).

For illustrative purposes, Cohen cites claims statutes allowing the *Delawares* to bring

suit. Id. at 12 n.64; see also Federal Indian Law Chap. VI, § B-1, at 463 & n.32 (U.S.

Dep't of Interior 1958); Cherokee Nation, 117 F.3d at 1502.

At most, Weeks stands for the proposition the Delawares reconstituted for claims

purposes. Whether the Delawares were reconstituted – be it through Act of Congress or

administrative practice – sometime after 1867 is not before us. See supra n.2. The

present case, instead, turns on the DOI's interpretation of the 1866 Cherokee Treaty and

1867 Agreement. We thus have a duty to follow Journeycake and Delaware Indians

because they directly control our interpretation of the agreement. Even *assuming*

Journeycake and Delaware Indians conflict with the dicta in Weeks (which they do not),

we nevertheless would be bound by those decisions. See Agostini v. Felton, 521 U.S.

203, 237 (1997) (explaining that "[i]f a precedent of th[e] Court has direct application in a

case, yet appears to rest on reasons rejected in some other line of decisions, the Court of

Appeals should follow the case which directly controls, leaving to th[e] Court the

23

prerogative of overruling its own decisions."); see also F.T.C. v. Kuykendall, 371 F.3d 745, 752 (10th Cir. 2004) (en banc).

V.

We are not unsympathetic to the Delawares' cause. The DOI's unlawful actions, however, cannot provide the Delawares the status they seek. The agency's decision to extend recognition to the Delawares rested on an alleged "comprehensive legal analysis" that devoted three sentences, in a footnote, to the Supreme Court's decisions interpreting the 1866 Cherokee Treaty and 1867 Agreement. Agencies, like courts, must follow Supreme Court decisions and congressional acts. The DOI's recognition of the Delawares in this case was contrary to the United States Supreme Court's decisions in Journeycake and Delaware Indians and violated § 103(3) of the Federally Recognized Indian Tribe List Act.

Agencies, moreover, must follow their own rules and regulations. The DOI used a procedure heretofore unknown to the law – "retract and declare" – to purportedly re-recognize the Delawares. In so doing, the DOI's actions were arbitrary and capricious. The agency simply elected not to follow the Part 83 procedures for recognizing an Indian tribe and, furthermore, did not even properly waive application of those procedures. See 25 C.F.R. § 1.2. We accordingly hold unlawful and set aside the DOI's 1996 final decision. 5 U.S.C. § 706(2)(A). Any action taken by the agency on its 1996 final

24

decision is void. "Further comment on this case is unnecessary." <u>Journeycake</u>, 155 U.S. at 218.

REVERSED.